Dreessen v. State.

MATILDA DREESSEN V. STATE OF NEBRASKA.

FILED NOVEMBER 21, 1893.   No. 5156.

1. **Homicide:** SUFFICIENCY OF EVIDENCE.   In order to sustain a conviction for a felony on purely circumstantial evidence the circumstances pointing to the guilt of the accused must be of so conclusive a character as to exclude every other reasonable hypothesis.

2. ——: ——.   It is not sufficient that the circumstances when considered together create a probability, although a strong one, of the guilt of the accused.

3. ——: ——.   To sustain a conviction for murder or manslaughter the *corpus delicti* must be established beyond a reasonable doubt; and where the circumstances relied on to prove that death was caused by the criminal act of a person other than the deceased are consistent with the theory that death was produced by natural causes, there is failure of proof.

4. ——: ——.   Evidence examined, and *held* not sufficient to exclude the hypothesis that death was produced by natural causes.

ERROR to the district court for Cherry county.   Tried below before CRITES, J.

*J. Wesley Tucker*, for plaintiff in error.

*George H. Hastings, Attorney General,* for the state.

POST, J.

This was a prosecution against the plaintiff in error and her husband, George Dreessen, in the district court of Cherry county, for the murder of their son, Theodore Dreessen. A trial was had resulting in the acquittal of George Dreessen and a conviction of the plaintiff in error of the crime of manslaughter, which she now seeks to reverse by a petition in error addressed to this court.   The information, omitting formal and introductory parts thereof, is as follows:

"And that they, the said George Dreessen and Matilda

Dreessen, then and there unlawfully, purposely, feloniously, and of their deliberate and premeditated malice, did strike, beat, and kick the said Theodore Dreessen with their hands and feet in and upon the head, breast, back, neck, belly, and sides, and other parts of him, the said Theodore Dreessen, and did then and there unlawfully, purposely, and of their deliberate and premeditated malice, cast and throw the said Theodore Dreessen down into and upon the floor and pound with great force and violence, with the intent aforesaid, thereby then and there giving to the said Theodore Dreessen then and there, as well by the beating, striking and kicking of him, the said Theodore Dreessen, in manner and form as aforesaid, as by the casting and throwing of him, the said Theodore Dreessen, down as aforesaid, one mortal wound and fracture in and upon the neck of him, the said Theodore Dreessen, to-wit, one fracture and separation of the fourth and fifth cervical vertebræ, of which said mortal wound and fracture he, the said Theodore Dreessen, then and there died."

In view of the conclusion reached with respect to the sufficiency of the evidence to sustain the conviction, it is deemed unnecessary to examine in detail the several questions discussed by counsel. It is sufficient to say that we find no error in the rulings of the district court during the trial, but we think the verdict should have been set aside on the ground that there was a failure of proof of the essential allegation of the information. The facts disclosed by the evidence of the state are substantially as follows: The plaintiff in error and her husband, George Dreessen, with their family of several children, resided at the time of the alleged killing on a farm, "or ranch," as it is described by the witnesses, in Cherry county. They are evidently foreigners, apparently ignorant, and, judged by their treatment of the deceased, wanting in the regard and affection commonly felt by parents for their children. So far as the record discloses, the other children, including an elder

son and daughter, were humanely treated, but Theo-
dore, the deceased, who was twelve years of age at the
time of his death, was treated with unusual severity,
and even cruelty, by both parents, and especially by
the accused, his mother.   It is in evidence that he was
seldom permitted to eat with the family and was required
to sleep during the severest weather in a sod addition to
the family dwelling, in a box filled with straw; and his
clothing was of the scantiest kind.   According to the tes-
timony of some of the witnesses, he was never known to
have had a hat or other covering for his head, and is shown
to have been the drudge of the family.   On one occasion in
the month of July, 1889, the deceased came into the house
with some fuel, when his mother struck him a blow upon the
head which felled him to the floor; at another time she
kicked him so violently as to knock him down; and at
other times she is shown to have slapped him in the face
and on the head while he was engaged in carrying two
buckets of water.   At the time of his death both of his
ears were deformed, which was caused, according to the con-
tention of the state, by freezing, on account of unnecessary
exposure.   On the 30th day of December, Mr. Corbett,
who resides two miles distant, was sent for by the father,
but arrived after the death of the deceased.   At that time
the body, which was still warm, was on a bed in the main
part of the house, covered with a feather bed and blanket,
and between the legs and at the feet were jugs of water.
Referring to the condition of the body at that time the
witness testified:

Q.  Did you pay any attention to his neck when he was
moved?

A.  Why, Mr. Dreessen took the pillow out from under
his head when I was crossing his hands.   I noticed his head
went down.

Q.  What do you mean by his head went down?

A.  They were spreading him out.   Mr. Dreessen took the

pillow out from under his head, and I noticed that his head dropped rather quick.    I think—I recollect he had a——

Q. Whereabouts did you notice the drop in his head,— in the neck?

A. Yes, sir.

Q. Can you tell the jury what part of the neck the drop was?

A. No, sir.

Q. You noticed it drop very quick.

A. Yes, sir.

Q. Describe it to the jury.    Can you by motion?

A. I don't know that I could.    It went down something like that.    (Indicating.)

Q. That was when you moved his legs down a little?

A. No, sir; that was after we straightened his legs. His father was at the head mostly.

Q. Did you notice the condition of his neck and face?

A. It was swollen.

Q. Did you notice anything about the head?    Was it covered or uncovered?

A. He had a towel tied around the head to keep the jaws up.

Q. Tell the jury what it was.

Witness: What the cloth was?

Harrington: Yes.

A. I couldn't say what it was.    I don't know whether it was a towel or a piece of cotton cloth.

Q. Can you tell the jury about how it was tied on, Mr. Corbett?

A. Drawn up here and tied on the back of his head.

*        *        *        *        *        *        *

Q. Did you notice his body and face and head?

A. Yes, sir; some.    I didn't see his body; that is, his extremity,—his limbs.

Q. Tell the jury anything you noticed about them.

A. I noticed he had some bruises on his face and hands.

Q. Describe these bruises, one by one, now.

A. He had a bruise across his nose, and he had one on his leg.  I don't know which leg it was, but there were three or four on his face.

Q. What color had they?

A. They had a scab on them, probably three or four days old, possibly older.  I didn't see any fresh scabs on him at all.

Q. Probably three or four days old, or something more, in your opinion?

A. Yes, sir.

Q. Did you notice his hands?

A. Yes, sir.

Q. Well, describe them.

A. He had some bruises on his hands and fingers that looked a good deal like the bruises on his face.

Q. What was their appearance?  Were they small or considerable size?

A. They appeared to be bruises where he had struck himself or had been struck by some instrument, as a boy would very often have on his hands.

Q. Well, now, how about the face?

A. Well, as I stated before, he had some bruises on his face.  He had one across the bridge of his nose about a half an inch square.

Q. About half an inch square?

A. I should judge it was.

On cross-examination the same witness testifies:

Q. There was nothing unnatural about that, was there—about his head dropping?

A. It arrested my attention at the time, and I concluded that his neck being so much smaller than his head, it would naturally drop quick.

Q. A dead body, warm like that, his head naturally would drop down, wouldn't it, if you take anything out from under it?

A. Be likely.

Q. You didn't observe anything about that head dropping or reeling around, anything more than would be common while the body was warm, did you?

A. No, sir; I think not.

Q. Mr. Corbett, you said in fixing this child, in straightening him out, his neck had swollen?

A. Yes, sir.

Q. Where was the swelling?

A. Around the neck, around his throat, and, as far as I saw, on his neck, and extended up to his cheek bones.

Q. The swelling was here and on the sides, and extended up to the cheek bones?

A. Yes, sir.

Q. Did you look on the back part?

A. No, sir.

Q. Did you see any bruises or purple ring around his neck?

A. No, sir.

Q. Nothing of the kind?

A. No, sir.

Mr. Zeller, another neighbor, saw the body the following morning and noticed the swollen condition of the neck. He also assisted to put the body in the coffin two days later, at which time it was rigid, but observed nothing peculiar about the neck or head, except the swelling above mentioned.

Some three months after the body was buried it was exhumed and carried twenty-five miles in a farm wagon, when it was removed from the coffin and an autopsy held under the direction of Dr. Holsclaw, one of the witnesses for the state. This witness testifies that he found on the body numerous scars, particularly on the back, face, and hands, extravasation of blood in the muscles of the neck, and a dislocation of the neck between the fourth and fifth cervical vertebræ; and states, as his opinion, that death was

caused by such dislocation. He states that decomposition had set in at the time of the examination; that the skin seemed to have suffered from decay, and the body was very offensive. He also testifies as follows :

Q. What, in your judgment, was the cause of death?

A. In my judgment the cause of death was the dislocation of those vertebræs.

Q. Would the moving of the body in the coffin produce the dislocation of those vertebræs.

A. Yes, sir; it is possible.

And on cross-examination he testifies as follows :

Q. You said in your judgment the dislocation of those joints was caused by some violence?

A. Yes, sir.

Q. Might it not have been done in some other way?

A. It is possible hauling the body all that distance. It is possible that it might have occurred after death.

Q. Taking a body in a decomposed condition and such a condition as this body was?

A. Yes, sir.

Q. Hauling it over that country, rough as it was, is it not possible?

A. I will say it is possible. I would not say it is probable.

Q. Such a thing could be done—might be done?

A. Yes, sir.

George Dreessen, the father, testifies that the deceased was taken sick three days previous to his death with a swelling on the side of his neck; that the first day it was not painful, but that he was advised by the witness to remain in bed. The next day he again advised the deceased to stay in bed, which the latter did for a part of the time, but retired for the night without taking any nourishment. The next morning the witness went to the bed of the deceased, who, in response to an inquiry as to his condition, said he felt better, and soon afterward arose and dressed, and was

engaged as usual during the day attending to the fire and
bringing water from the pump, but complaining of pain
in his neck, and retired before supper. That evening the
witness carried food to him after he had retired, but did
not observe whether he ate of it or not. The witness' ver-
sion of what transpired the next day is best shown by his
own language : " Well, the next morning when I got up,
I went into where we sleep. I waken first Christian, and
I waken Mrs. Dreessen, and I waken Margaret. Then I
built the fire, and after I built the fire I went to his bed,
and when I came to his bed I said, 'Theodore.' He, per-
haps like all the boys, you had to call him three or four
times; but he made a move, and after I called him three or
four times he opened his eyes and kind of stretched himself,
and he turned over this way. He laid on his side, and
he turned over this way. Well, I said, 'Theodore, are
you awake?' Well, he didn't say anything, and, of course,
I thought that because he opened his eyes and turned over,
I went out into the kitchen again; and I went to make
the breakfast and help Mrs. Dreessen; and Christian
went out and done the outside work; and after breakfast
was ready I says, 'Is Theodore up yet?' and they says,
'nobody has seen him.' Well, I went to his bed then,
and he laid just the way he turned over. He laid on his
side and turned over this way; and I took my hand and
touched his forehead, and his forehead was cold; and I went
into the house and I says, 'I believe Theodore is seriously
sick,' and I says to Mrs. Dreessen and Margaret, and I and
Mrs. Dreessen went up to his bed, and then I took the cover
off. He was covered up then. He had three blankets to
cover up with, and a big wagon sheet, twelve feet wide and
sixteen feet long; then we lay him on top of these blankets,
and after I had done that I felt under that. I seen that
the skin of his body was cold all over. I felt down his
limbs, and after that I placed this cover back, and we carried
out some more heavy blankets laid in bed with him, and I

says, 'Christian, you had better eat, and saddle the pony,' and Ayers down there, I think he is kind of a doctor; 'and you had better go down to Ayers and ask him if he won't be so kind to come; Theodore was sick; he was cold where his skin was;' and he eat a bite and took the pony and went away to Ayers, and I says, 'Christian, we are running back and forth, and we keep the door open and every once in a while,' I says, 'we had better take him up-stairs;' and we take the blankets hold of here by the feet, and I at the head, and we take him upstairs, and Mrs. Dreessen came up, and we laid him there in the bed, and I says, 'you had better get some warm water and jugs of hot water, and we will lay them, one at his head and one at his feet; and we will warm some blankets and wrap them around him;' and he laid there, and I staid with him part of the time, and Mrs. Dreessen warmed blankets and we kept warm blankets around him for quite a while, until we look out of the window. The boy had to come back from the southwest way, that was the way towards Ayers. I looked down and the boy didn't come back, and nobody was coming. At last I see the boy coming across lots in the valley, perhaps eighty rods away. This valley is about half a mile away. Margaret, my daughter, was upstairs with me tending the boy, and I went down stairs to meet Christian coming back from Ayers; and I says to Margaret to see to Theodore, and I went down stairs, and the boy don't come to the house; and I says, 'where is Ayers?' and he says, 'Ayers don't have time to come, but he gave me a bottle of medicine.' It was a patent medicine. I told him if Ayers couldn't come to stop at Mr. Corbett's to request Mr. and Mrs. Corbett to come over; and I says, 'what did Mr. Corbett say?' Well, the boy answered me, Mr. Corbett didn't know anything about sickness, and I says, 'you just start back as quick as possible and tell Mr. Corbett he has to come.' He started off on horseback on the run and I went back in the house, and that time I got in the house

Margaret came down stairs and says, 'papa, Theodore got blisters before his mouth,' and I run upstairs. I listened with my ears this way a little while, and his breath was gone."

Q. Who is Margaret that you speak of?

A. That is my daughter.

Q. Where had she been?

A. Upstairs with Theodore.

Q. How came she to be there?

A. I left her there.

Q. What directions did you give her?

A. To stay with Theodore there while I go down to meet Christian.

Q. And she come down running, telling you that something was wrong with his mouth?

A. Yes, sir; some blisters was running out of his mouth.

Q. What condition did you find him in?

A. He was dead.

Q. About his mouth, how was that?

A. There was some matter and blood mixed running out of his mouth; and when I got up I put my hand under his neck and cheek to rest him up.

Q. That was the night before?

A. No; that morning when he died.

Q. What time was it in the morning when he died?

A. We have no clock running at that time. I judge it must have been between 12 and 1 o'clock. It might have been 1 o'clock.

His explanation of the scar on the nose of the deceased is that two or three months previous, while the latter was assisting to clean the room in which he slept, he was struck by a hoe which fell from overhead and inflicted a wound, which had not healed. His explanation of the other scars and sores upon the body is that they were caused by disease of the skin. He admits that the deceased was scantily and sometimes insufficiently clad, but says he was unable to

better provide for him, and that, taking into consideration the services required of him, he was as well provided for as the other children. He is in the main corroborated by the plaintiff in error, and also by Margaret, the daughter to whom he refers. The last named witness, after testifying that she was with her brother when he died, proceeds:

Q. What direction did your father give you just before he did die?

A. You mean what he told me to do?

Q. Yes.

A. He told me to warm blankets and see to him.

Q. To see to him?

A. Yes, sir.

Q. Where did your father go just then?

A. He was up there too.

Q. Did he not go away from there and leave you there alone?

A. Yes; when they sent Christian to Ayres he come back.

Q. Then when Christian returned from some place, what did your father do or say?

A. He was going out to see if that man was come.

Q. What did he tell you when he started out?

A. He told me to stay by there?

Q. To do what?

A. He didn't tell me to do anything.

Q. Just to stay in the room with Theodore?

A. Yes, sir.

Q. Was Theodore living at that time?

A. Yes, sir.

Q. Now, tell those men there whether, at the time your father started down to meet your brother Christian, and left that room in which Theodore was—now you tell them whether or not Theodore was living.

A. Yes, sir.

Q. He was alive?

A. Yes, sir.

29

Q. How long was it until your father came back again?

A. It was about a few minutes.

Q. How many, ten or twelve?

A. No, I don't think. I guess five or six.

A. What caused him to go back?

A. I told him Theodore died.

Q. You come and told him your brother Theodore had died and he run back; is that right?

A. Yes, sir.

Q. Was you there during that day?

A. At home, I was all day.

Q. Do you remember when Theodore was brought out from the sod building and put in the bed upstairs?

A. Yes, I remember that.

Q. Now, at that time was he dead or alive?

A. He was alive.

Q. Did you see your father and mother on that day? Was you up in the room pretty nearly all the time?

A. Yes, sir.

Q. Did you see them on that day beat, kick, and hit Theodore on the head, and on the arms, and on his back and on his belly, and take him up and throw him on the floor and on the ground?

A. No.

Q. Did they do such a thing that day?

A. No.

Q. What time in the morning did they bring him up from that sod building?

A. It was before breakfast.

Q. What time was breakfast? Seven or eight o'clock?

A. I guess so.

Q. Was Theodore ever down from upstairs until after he was dead, after he had been taken up that morning? From the time that Theodore was taken up on the morning that he died, was he down stairs until after he died?

A. No.

Dreessen v. State.

For the purpose of impeaching this witness the state produced the sheriff, who testified that she had stated on her examination before him, while conducting an inquest as acting coroner, that she did not see the deceased upstairs the day of his death until after her father had gone away.

Mr. Marsh testifies that he dressed the body of the deceased before it was entirely cold, and afterwards assisted in placing it in the coffin; that the left side of the neck was swollen and discolored, but he did not observe that it was discolored elsewhere, nor was there anything peculiar about the neck or head. An attempt was made to impeach this witness, which was not entirely successful, in view of the fact that as to all material facts he is strongly corroborated by the state's witnesses, Corbett and Zeller.

In determining the effect of the foregoing evidence it should be borne in mind that the information contains a specific charge of murder, as it is therein alleged that death was caused by the dislocation of cervical vertebræ, or, rejecting the technical terms, by the breaking of the neck of the deceased. In the brief of the state it is said: "No testimony was offered at the trial directly bearing upon the matter of the injury to the neck. The conclusion as to that matter must be drawn from the facts and circumstances surrounding the case." And we may add that the only evidence tending to prove that death was produced by the alleged fracture is the testimony of Dr. Holsclaw. It may be admitted that his testimony is sufficient to create a strong probability of the correctness of the theory of the state; but it is certainly not of that convincing character which may be said to exclude every other hypothesis, and which is required to sustain a conviction upon purely circumstantial evidence. (See *Casey v. State,* 20 Neb., 138, and authorities cited.) Assuming that the witness discovered a dislocation of the bones of the neck, the theory that it may have been caused by the removal of the body in a wagon twenty-five miles, when so decomposed as to be dis-

colored and exceedingly offensive, is, to say the least, a reasonable one. If we reject all of the evidence for the accused, still his conclusion that the discolored condition of the neck was produced by extravasation of blood before death is insufficient to exclude the theory that it was produced by natural causes; and that theory is strongly supported by the fact that the body remained in the house of the accused three days after death, and was during that time inspected by at least three of the neighbors, who failed to note any circumstance tending to sustain the contention of the state. The claim of the accused is that the appearance of the neck of the deceased was caused by inflammation before death, which interfered with the circulation and produced the swelling and discoloration of the skin. That contention is sustained by the testimony of Corbett and Marsh, who observed the swollen condition of the neck and extending up to the cheek bone while the body was still warm, and also by Zeller, who observed the same thing after *rigor mortis* had set in. No attempt was made by the state to explain that condition by showing that it occurred after death or that it might have been caused by dislocation of the neck.

We are satisfied, after a careful examination of the entire record, that the state has failed to establish the *corpus delicti*, and that the judgment of the district court should be reversed. It must be confessed that the conclusion reached upon the reading of the record for the first time was that the verdict of manslaughter was fully justified by the evidence, on the ground that the death of the deceased boy was the proximate result of long continued neglect, deprivation, and exposure by the accused, which is barely outlined in the statement given above, and in character so unlike that of a mother as to almost challenge belief. Had the charge been manslaughter, and in the form contemplated by statute (Criminal Code, sec. 425), it is probable that the judgment might be sustained. It is apparent,

however, from a careful reading of the information, that evidence of cruelty toward the deceased was received for the purpose of proving malice only, and is therefore immaterial, except so far as it tends to establish the charge of killing by the particular means alleged. For the reason that there is a fatal variance between the proofs and the information the judgment of conviction is

REVERSED.