# EARL TREPPISH v. STATE OF NEBRASKA.

FILED JANUARY 26, 1934.   No. 28781.

*D. R. Mounts* and *Lyle E. Jackson*, for plaintiff in error.

*Paul F. Good, Attorney General,* and *Paul P. Chaney, contra.*

Heard before GOSS, C. J., ROSE, GOOD, EBERLY, DAY and PAINE, JJ., and CLEMENTS, District Judge.

CLEMENTS, District Judge.

The defendant, Earl Treppish, was charged in the information with the crime of murder in the first degree. He was convicted of murder in the second degree, and sentenced to the penitentiary for life, and prosecutes error to this court.

The petition cites 66 allegations of error. Many of these are not urged and need not be noticed.

The third, seventh and eighth assignments of error may be considered together, as each is based upon the proposition that the evidence is insufficient to support the verdict.

The determination of this question has required a careful and patient examination of a bill of exceptions consisting of nearly 700 pages. Such examination discloses that there is little dispute as to the main facts in the case. The dispute arises over the conclusions to be drawn from such facts.

Summarizing the evidence as briefly as possible, it is as follows: In the spring of 1931, the defendant, Earl Treppish, whose home was in the state of Wisconsin, where he has a wife, father, and other relatives, was in Wyoming, where he had gone to procure work. At the ranch of one Ostrom, near Sheridan, he met and became acquainted with Clarence Coy. Coy was a one-armed man, having lost an arm some years before through the accidental discharge of a gun. The kind of work he could perform was somewhat restricted by this misfortune, and he was in Wyoming for the purpose of getting a job

"tramping wool" (packing wool in sacks at shearing time).

Both Treppish and Coy were employed for a time on the Ostrom ranch, and their employment there ceased on the same day. Neither had definite plans for the future, and they decided to seek work in Kansas, where Treppish had acquaintances. They went by rail to Denver, where Coy purchased a used car for the sum of $50. With this car they drove to Kansas, where they were unsuccessful in finding work for both, and concluded to go to the wheat fields of Dakota. En route to Dakota, the car broke down, and they were delayed some three or four days while Treppish, who had had some experience as an automobile mechanic, repaired it. Failing to find work in South Dakota, they returned to the Ostrom ranch in Wyoming. Here they decided to embark on a trapping venture in Holt county, Nebraska. They then drove to Wisconsin, where Treppish said he could procure equipment for trapping. During the trip to Wisconsin, an arrangement was made whereby Treppish, in consideration of $20 loaned by him to Coy, and the work Treppish had done in repairing the car, became half owner of the car, and they were to share fifty-fifty in all equipment used in trapping and all proceeds of the venture. (Treppish's evidence.) The fact of the partnership is, however, established by the evidence of several of the state's witnesses.

Arriving at Mauston, Wisconsin, where Treppish's father and relatives reside, he procured from these relatives, and from friends, traps, guns, bedding, cooking utensils and rubber boots. With this equipment, they returned to Holt county, Nebraska, and, procuring like equipment which Coy had there, proceeded to the head of Beaver creek to commence their trapping venture. Coy had told Treppish that he had a house or shack at the head of Beaver creek, in which they could make their headquarters. On arriving at the place, they discovered that the house had been burned. Coy, when he found this, exclaimed, "The dirty skunk," but explanation of this

remark, or to whom it referred, is not found in the evidence. They camped on Beaver creek for a short time, then removed to an island on the Niobrara river, north from Dustin, Nebraska. Here they built a boat, 18 feet long, with a beam of 54 inches, and procured an engine or motor for it, and here an occurrence took place which, together with the burning of the house, is contended shows enmity of some person or persons toward Coy.

One evening while they were in camp, a noise in the brush was heard and, thinking it was a bobcat which had been stealing their meat, Treppish took a gun and, stepping outside the tent, shot at an object which he thought was the cat, but which proved to be a stump. His shot was immediately followed by a fusillade of shots from across the stream, some of which went through their tent, and one of which went through Treppish's hat. Abusive epithets were also applied to them, and a threat to burn their car shouted to them. This occurrence was investigated by the sheriff of Holt county, but without result. Because of this occurrence, Coy and Treppish moved their camp to a more secure place on the island, and remained there until in November. After this they made various moves, and in January of 1932 established a camp at Spring creek, on land belonging to a Mr. Sweet. Here they were visited a number of times by sons of the owner of the land. One of these visits was on March 31, 1932. At this time both Treppish and Coy were in camp. Some conversation was had with Treppish, in which he made the remark, "It is getting close to moving time." This was the last time, so far as the evidence shows, that Coy was ever seen alive by any person other than Treppish.

On the next day, April 1, Herbert Sweet visited the camp site. He found Treppish there breaking camp. He said they were going back on the island for awhile. Asked where Coy was, Treppish said, "He is down at the river, down the creek, picking up some traps." Thereafter, both Treppish and Coy disappeared.

Some weeks after the disappearance of the parties, the

relatives of Coy became uneasy at his continued absence, and asked the sheriff of Holt county to make an investigation. The sheriff made inquiries which resulted in finding Treppish working at the Bauman ranch, a short distance from Sheridan, Wyoming, but no trace of Coy was found.

Treppish was arrested and held in jail at Sheridan until the officers from Nebraska came and brought him back to Holt county. When Treppish was arrested he had, at the Bauman ranch, the car which the parties had had in Holt county, and at the Ostrom ranch was found the other property which he had brought with him, viz., about half the traps which he and Coy had been using in Nebraska, and a gun and two revolvers, which were identified as having formerly belonged to Coy.

Upon the arrival of the Holt county sheriff in Sheridan, Treppish told him when and where he had last seen Coy; how he came to Wyoming; what places he stopped at on the way out; and detailed all his movements and activities after arriving in Sheridan. A check by the sheriff showed that these statements were substantially accurate. He told the sheriff the story of his leaving Coy, and their agreements and future plans practically as he detailed them in his evidence taken at the trial. He assisted the sheriff in locating the traps, guns, and other property brought by him from Nebraska, and returned with the sheriff to Holt county without objection and without extradition papers.

Now follows the explanation of his presence in Wyoming without his partner Coy, as detailed by him at the trial of the case. He testified that for some time prior to April 1, 1932, he and Coy had been considering a plan whereby he, Treppish, would go to Wyoming and obtain work for the summer, and Coy would remain in Holt county on the island in the Niobrara river, where they had camped and where their boat and engine were located, for the purpose of gardening and raising vegetables for their use in trapping the following winter. No defi-

nite conclusion was reached as to this until the evening of March 31. On the 28th day of March, Treppish and Coy met a man by the name of John Brost, who had been gardening on a small tract of land not far from the island in the Niobrara, with whom they had had some previous conversation about gardening. This matter was again brought up, and a tentative agreement between Coy and Brost was entered into. Brost was to furnish the seed and team work for a garden on the island, and Coy was to plant and tend the garden, and they were to share fifty-fifty on the produce raised. (This is from the evidence of the witness Brost.)

The state, for the purpose of rebutting the evidence of Brost, called several witnesses who testified that the soil on the island was poor and not suitable for gardening.

Treppish testified further that on the evening of March 31 it was definitely decided that Coy should remain and engage in the gardening venture, and Treppish was to take the car and go to Wyoming, obtain work, secure a grub stake, and return in the fall, when trapping would be resumed. They had a few furs on hand which were divided. All their traps on Spring and Otter creeks had been taken up except some that had been set at badger holes. These were not taken up because the badgers had not yet begun to come out of their winter quarters. Treppish was to take some of the larger traps with him to Wyoming for the purpose of catching coyotes and bobcats for the bounty offered by that state. He was to take some small traps which had proved too small for their purpose and try to exchange them for larger ones. He was to take the rifle belonging to Coy for the purpose of night shooting, which means in the parlance of the sheep industry, patroling the range in the night, shooting a gun at frequent intervals to keep marauding animals away from the sleeping sheep. One of the revolvers he had bought from Coy, and the other he took in place of a German Lueger revolver, which he left with Coy, because Coy liked it better than his ".38." All the balance

of the equipment was left for Coy's use. This included traps, which had been taken up, and traps still set at the badger holes, tent, cooking utensils, a sheet steel stove (this stove was afterwards found on Spring creek), guns, bedding, and bedding roll, and Coy's personal belongings (all of these except the gun were afterwards found in the bed of Spring creek).

As Coy was to remove to the island as soon as he had taken up the traps set for badgers, it was agreed that all of this equipment, except the stove, some cooking utensils, and the tent, was to be transported by Treppish the following morning in the car to the bank of the Niobrara river and left there at a point opposite from where their boat was kept. The stove, bedding roll and other things were not to be taken because Coy expected to establish himself in a little shack higher up on Spring creek until the badger trapping season was over.

On the morning of April 1 the parties were up at daybreak. Treppish prepared breakfast while Coy rolled his bedding and gathered the articles he was to keep on Spring creek. After breakfast was over Coy, remarking that he must get out on the trap line because if he had caught a badger during the night it was likely to gnaw itself loose, shouldered his bedding roll, bid Treppish good-bye, and departed, and this was the last time he was seen by Treppish.

After Coy left, Treppish broke camp, loaded in the car the equipment he was to take to the river for Coy, also the articles he was to take to Wyoming, drove to Dustin, where he stopped at the post office and got a letter from his wife, then drove to the river and left the equipment for Coy at the point agreed upon. He then went to Stuart, Nebraska, where he presented to a bank for cashing a fur check. He was told by an officer of the bank that, as he was a stranger, he would have to be identified. He then went to an acquaintance, one Johnny Miller, had the check indorsed by him, and secured the money on the check without further trouble.

From there he went to Bassett, Nebraska, and then to Norden, where he was delayed two or three days waiting for a casing that had to be ordered. From Norden he drove by easy stages to Sheridan, Wyoming, and from there went out to the Ostrom ranch, where he and Coy had worked the summer before. He afterwards secured work at the Bauman ranch, where he was arrested.

Such is the story as told by Treppish upon the witness-stand. It was given in a frank, straightforward manner, and with a wealth of detail impossible to include in this summary. A long and grilling cross-examination failed to shake it. It was not rebutted except in two particulars.

The postmistress at Dustin and several others who were in the post office during the 1st of April testified that Treppish was not there on that day. However, the letter from his wife was directed to him at Dustin, and was postmarked Milwaukee, Wisconsin, March 25. It must have been delivered to him from that post office, Dustin, either on the 1st of April, or within a few days prior thereto, but the postmistress does not attempt to state when it was so delivered, nor could she or the other witnesses remember any person who received mail from the post office on any other date.

Several rebuttal witnesses were introduced who testified that they were at the river on or about the 1st of April, at or near the post where Treppish testified he left the equipment for Coy, and that nothing of the kind was there.

We will now proceed to further developments in the case as disclosed by the evidence. To understand these developments, it is necessary to know something of the topography of the country where the camp on Spring creek was located. Spring creek is a little brook, normally about a foot wide and two or three inches deep. It runs through a canyon or gulch with very steep sides; this gulch falls sharply toward Otter creek into which Spring creek empties. The camp was located on a shelf on the side of this canyon, about 60 or 70 rods from

where the two creeks join. At some distance above the camp, near the head of Spring creek, is the little shack where, according to Treppish, Coy was to make his headquarters for a time after Treppish left. The country around the camp is very rough and heavily wooded. Otter creek is a much larger creek than Spring creek and runs in a northerly course to the Niobrara river. Both creeks are subject to floods during and after heavy rains.

After the sheriff had returned Treppish to Nebraska he, the sheriff, on July 17, 1932, made a search of Spring creek and Otter creek, and the vicinity of the camp.

Near the camp site, the sheet steel stove and some stove pipe were found. About 100 yards below the camp site, in the bed of the creek, there were found a bedding roll, bedding and clothing, all identified as having belonged to Coy. A short distance from where the bedding roll was found, a small piece of bone identified as a piece of a human skull was picked up from the bank of the creek, 60 or 70 rods below the junction of Spring and Otter creeks; in Otter creek were found some bones of a human skeleton. These bones were identified as being from the skeleton of Clarence Coy. The skull was missing and was never found.

At the close of the evidence, defendant moved for a directed verdict in his favor on the ground that the evidence was insufficient to show that a crime had been committed, or that Clarence Coy came to his death through the unlawful agency of Treppish. This motion was overruled, the case was submitted to the jury, and a verdict of murder in the second degree returned.

The theory urged by the prosecution to the jury, and now urged to the court on the appeal, is that, on the night of March 31, or the morning of April 1, 1932, Earl Treppish killed Clarence Coy, breaking his skull with some weapon, the nature of which is not disclosed. That to conceal the crime, Treppish buried the body and Coy's bedding roll and belongings in the bottom of Spring creek, about 30 feet above the camp, and that a flood in the

creek some time in the summer washed the body, bedding and clothing down the creek to where they were found in July. Of course this may be the correct solution of Coy's death, but it is based entirely upon surmise.

There is no evidence that Coy's body, or his belongings, were buried in Spring creek. Some parties testified that about 30 feet above the camp some stakes were driven in the creek; that on these stakes had collected some brush and débris; and that in this débris were found a bottle, some tin foil from a cigarette package, and two sodden cigarettes. This is all the evidence that in any way relates to this part of the theory of the prosecution. It seems the height of absurdity to imagine that, to conceal a crime, a murderer would bury the body and then mark the grave by driving stakes around it.

There is no evidence that Treppish killed Coy by blows that broke his skull. Coy's skull was not found and, so far as the evidence discloses, his skull may be buried in the mud of Otter creek entirely intact. The piece of skull found was not and could not be identified as part of the skull of Coy. It was not found in the same place or near the other bones. The expert witness, called by the prosecution, could not and would not identify it as a part of Coy's skull. He, Dr. Wilson, testified: "Q. Now, handing you state's exhibit 13 (the piece of skull), is there any identity between that and the rest of the bones here (the skeleton of Coy)? A. No. Q. It is not possible to identify that as belonging to this body? A. No."

Not only was the piece of skull not identified as being part of the skull of Coy, but the condition in which it was found raises a strong presumption that it could not have been from his skull. It will be remembered that Coy was seen alive on the 31st day of March. This piece of skull was found on July 17, and yet it was in such a condition that it broke in two when picked up. It can hardly be credited that in 108 days after the death of Coy a piece of his skull would be in such a state of

disintegration that it would fall to pieces when picked up. It seems more reasonable to suppose that this piece of skull had laid for years in the vicinity of Spring creek, and had been washed into the creek by some of the many rains that occurred there in years past. This supposition is made more tenable by the fact that other unidentified skeletons had previously been found in the locality covered by the testimony in this case, viz., near the Grand Rapid bridge across the Niobrara river. (See evidence of George Robertson, page 211 of the bill of exceptions.)

If the theory of the prosecution is not supported by the evidence, and we must find that it is not, then the manner in which Coy met his death is purely conjectural. He may have died from natural causes. Heart disease or cerebral hemorrhage may have taken him suddenly while on the precipitous banks of Spring creek, and his body rolled or washed into the creek.

"The fact that the deceased died suddenly never warrants an inference that he was foully dealt with. It is for the state to prove that his death was the result of a criminal act, and, unless or until this is proved, it is presumed that death resulted from natural causes." Underhill, Criminal Evidence (2d ed.) 541, sec. 312.

He may have been shot by some person unknown. He may have met his death from a fall. He may have been drowned while Spring creek was in flood. Treppish may have killed him in some manner not disclosed.

We cannot determine from the evidence when he died, the cause of his death, or whether any person was criminally connected with it. The *corpus delicti* has not been proved.

If the fundamental fact of Coy's death, through the criminal agency of some person, was established, then the fact that Treppish last saw him alive, the finding of Treppish in Wyoming with the car, and all the facts and circumstances of the association of the parties are competent to be considered to connect Treppish with the crime. It may be doubted that the evidence is sufficient for that purpose.

No motive for the crime, on the part of Treppish, is shown. The relation of the parties was friendly. The car taken by him was of no greater value than the boat left behind. His actions after the alleged crime were not such as would be · expected of a person guilty of murder. His story is not impossible of belief and is strongly supported by some of the circumstances that are undisputed.

Treppish told just what articles he left with Coy on Spring creek. All of these, with the exceptions of the gun and traps, were afterward found on Spring creek. Among the articles left were a bed roll and bedding. The evidence shows this was the only bed roll had by the parties. Treppish, when he reached Sheridan, was obliged to buy a bed roll on credit and pledge a revolver as security for it. If, when Treppish left Spring creek, Coy was dead and Treppish was appropriating his belongings, why would he have left the bed roll and bedding? Treppish told just what articles he took to the river and left for Coy. None of these articles have ever been found, nor is there any evidence that Treppish thereafter had or disposed of them.

It is contended that his evidence as to leaving these articles at the river is rebutted by evidence of parties who did not see them there. However, the boat owned by the parties was on the island just opposite where Treppish said these articles were left. Treppish could not have taken the boat with him, but it disappeared and has never been found. If the boat was stolen, it is at least possible that the articles which Treppish claims to have left on the bank of the river were taken at the same time.

There is much about this case that is mysterious, and suspicion inevitably pointed to Treppish, but suspicion is not sufficient to establish that a crime has been committed.

Having reached the conclusion that the case should not have been submitted to the jury because of the failure of the state to prove the *corpus delicti,* it will not be neces-

sary to devote very much time to an examination of other allegations of error.

The alleged error most earnestly urged is that, after an order had been made by the trial judge, excluding all witnesses from the courtroom except when called to testify, certain of the state's witnesses remained in the courtroom, heard the testimony of all or many of the other witnesses and were then permitted to testify in the case over the objections of the defendant.

It seems that, through a misunderstanding of the extent of the court's order, the witnesses in chief for the state, after testifying, remained in the courtroom during the remainder of the trial. Some of these were called as rebuttal witnesses. Other witnesses called on rebuttal alone had also been in the courtroom and heard all the evidence in the case. The defendant objected to any of these witnesses being permitted to testify after they had remained in the courtroom and heard the evidence of other witnesses, all in violation of the court's orders. This objection was overruled and the witnesses permitted to testify.

It does not appear that the trial court had any knowledge of the violation of this order until it was called to his attention by the objections of defendant. We have carefully examined the evidence given by these witnesses and do not find that it was of a nature to have been influenced by what they heard from other witnesses. Therefore no prejudice to the defendant resulted from the unintentional disregard of the court's order.

It is urged that the trial court interfered in the examination of defendant's witnesses, continually urging the defendant's attorneys in their examination of witnesses to hurry, and continually interrupting the defendant's attorneys in their examination of witnesses, thereby prejudicing the jury against the defendant. It is the duty of a trial court to expedite the trial as much as is possible without infringing the rights of the parties to a complete and orderly examination of all the facts and

circumstances connected with the case. In his endeavor to expedite the trial in this case, the trial judge used some expressions that perhaps would have been better omitted. However, we are satisfied reversible error cannot be predicated thereon.

Complaint is made that there was misconduct on the part of the prosecuting attorney in his argument to the jury, in that he called Treppish a liar, called attention to the crowd in the courtroom as being Coy's friends and said, "There have been men killed in this county for less money than that, and one of them not very long ago." If such remarks were made, they were clearly improper and prejudicial. However, no record of such remarks appears in the bill of exceptions nor are the statements in plaintiff's brief substantiated by affidavit or in any other manner. They cannot therefore be considered.

Many other alleged errors are cited, which we think need not be commented upon.

We find no reversible error in the case save and except the overruling of the defendant's motion for a directed verdict because of failure of proof that the death of Clarence Coy resulted from the unlawful act of the defendant Earl Treppish.

For this error, the cause must be reversed.

REVERSED.