JAMES REYES, PLAINTIFF IN ERROR, v. STATE OF NEBRASKA, DEFENDANT IN ERROR.

38 N. W. 2d 539

Filed July 14, 1949. No. 32603.

*Olsen & Holtorf,* for plaintiff in error.

*James H. Anderson,* Attorney General, and *William T. Gleeson,* for defendant in error.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

BOSLAUGH, J.

James Reyes, designated herein as defendant, was convicted of the crime of murder in the second degree, and prosecutes error to review the record of his conviction.

On September 3, 1948, at about 9 a. m., two men and two women entered John's Tavern in Lyman, Nebraska. One was Jake Henry, a cowboy, and the women and the other man were unknown to the men in charge of the tavern, but the man was later identified as Freddie or Jake Burkheart. The women were referred to as the "black-haired woman" and "that blond girl." The record

does not identify the woman with the blond hair. The other was later learned to be Avis Phillips, the victim of the alleged crime with which the defendant is accused. They indulged in conversation and drank beer.

James Reyes, the defendant, entered the tavern about 11 a. m., had a beer, and was later in company and drank beer with the four persons above referred to. He drank five or six bottles of beer and bought one round of beer for the others. Jake Henry and Avis Phillips were continuously in the tavern until she left with the defendant sometime between 2 p. m. and 3:30 p. m. She talked most of the time to Jake Henry, but had some conversation with the defendant. She told the defendant, while they were in the tavern, that she had to get out of Lyman, that a woman had to make a living, and she solicited the defendant to have immoral association with her for a monetary consideration. Defendant purchased a half-pint of whisky in the tavern, and shortly thereafter he departed from the tavern in company with Avis Phillips. They left Lyman in the automobile of the defendant, a Model A 1927 Ford tudor coach.

They traveled north and east from Lyman about two miles, about one-half mile west to a large cottonwood tree, remained there for about an hour, and engaged in the conduct in reference to which the deceased had solicited the defendant. They then traveled east about one-half mile and north some distance to a hay field, where they repeated their illicit indulgence. On the trip from Lyman to the cottonwood tree, they each drank a part of the whisky purchased by the defendant. The deceased had the bottle thereafter, and she drank the last of the whisky near the Mitchell Ditch, hereafter referred to. They decided to return to Lyman and drove south on a north and south road, the first section-line road, east of that town, and traveled but a short distance when the deceased, without warning, leaped from the car then moving about 15 miles an hour. She

landed in the borrow pit by the side of the road. Defendant immediately stopped his car, inquired why she jumped, warned her it was dangerous, and that she might get killed. She made light of his anxiety. He asked her to get in his car and he would take her to town. She positively refused, and said she preferred to walk. He drove south on the highway about one-half mile. It was hot and he decided to turn around and go back and again offer her a ride. In turning around the back wheels of his car sank in the grade of the road and he had to get help to get it back on the road. A farmer, Henry Nolde, pulled him out with a tractor. In the meantime the deceased had walked down the road past the place where the car was being pulled out. He drove south in the vicinity of the Mitchell Ditch, stopped his car, and asked the deceased to let him take her to town. She refused and he drove farther south, turned and drove north again until he came to the deceased, stopped his car, asked her to ride, and she got in the car. They then drove north. She complained she had no money, and that she had thrown the five dollars he had paid her when they were at the big cottonwood tree in the car as she jumped out the first time. They could not find the money in the car. They got north to the intersection with the road going east and slightly north, and stopped. She insisted that he take her to Morrill. This he agreed to do. They started down the road to the northeast at a speed of from 30 to 35 miles an hour. She said, "Oh, what the hell, I don't want to go to Morrill," opened the door and jumped out of the car. There was a noise as if something struck the car. "At that time I heard something pound on my car * * *. I didn't know if she got hurt on the car door or if she got hurt on the side of the car * * *. I got scared." The defendant did not know what to do. He continued to drive east on the highway. The distance he traveled east and the time involved are not definitely fixed. Sometime

later he met a car traveling west, and he then returned to the place where Avis Phillips left the car. The man he had met who was traveling west, two other men, and Roy Coffin, the village marshal of Lyman, were there.

The marshal was told by George Ring and his son that a woman was lying in the road "like maybe she had been hit with an automobile." He went about to the intersection near Horse Creek bridge, at the farm of Mr. Kramer, where there is a country road extending north and south, and from which a road proceeds in a slightly northeasterly direction, referred to as the lower road. "It was just around the corner where the lady was laying on the road" northeast from the intersection of the two roads. Her head was near the edge of the shoulder of the road, her feet were about in the traveled part of the road, and her body was on an angle. This was sometime between 4 p. m. and 5:15 p. m. on September 3, 1948. The body was about 60 yards northeast from the intersection, and on the right of the road looking from the intersection to the northeast. There was a shoe on her right foot. There was no shoe on the left foot, but the shoe she had been wearing, with the heel detached therefrom, was near her on the edge of the shoulder of the road. Her dress was torn around her right shoulder and her waist in the back. There was no one with the body of Avis Phillips when George Ring and Henry Ring saw it in the road before they went into Lyman and notified the marshal. The marshal, Irvin Freel, and James Reyes, the defendant, came there about the same time. Defendant denied knowing or having seen this woman before. Before he left he told the marshal he was going to, and would be in Lyman. A doctor arrived at the place where she was about 5 p. m. He examined her, found she was bleeding from her left ear, her nostrils, and her mouth, her left side was completely paralyzed, and she was unconscious. He attended her until her death

on September 7, 1948. She did not regain consciousness.

He conducted an autopsy, and when he removed the top bone of her head "there was kind of a watery fluid ran out * * *." There was about one-sixteenth of an inch lapping of bone on the side of her head running from about the angle of the eye to the mid-occipital region in the posterior aspect of her head. The upper fragment of the bone over-lapped the lower temporal bone on the side of her head. There was a lot of blood inside the skull, a few adhesions attached to the dura and skull proper, much of the blood was directly in the brain tissue, and big clots of blood underneath the meninges of the brain. There was an area of considerable size at the base on the right side of the brain which had gone into soft tissue and sloughed off and made a hollow mass in this region. There was a fracture to the base of the left eye and into the ear proper. His opinion was that the deceased came to her death by "some type of blow, that is all I could tell; some large surface, it couldn't be anything narrow because there wasn't any indentations, it covered too large a surface; it had to be something pretty round and pretty firm." The blow had to be on the side of her head at about the top of her ear line. A very hard and severe blow to get that extensive a fracture, by something that was blunt, flat, or somewhat rounded instrument. He gave it as his opinion that all her injuries were caused by one blow, that her injuries were caused by some object with a broad surface—not by "something like a crank or anything small of that sort * * * it would have to be something heavy and wide, if it was narrow I think you would have a localized fracture * * *. It would be a cut or a black and blue spot, but she didn't have that." When he was asked if he thought that an injury such as she suffered would have been caused by her being struck by any part of a motor vehicle when she jumped from it, he stated, "Well, I wouldn't know."

A deputy sheriff testified that he had a conversation with Avis Phillips in her room in the hospital, notwithstanding the doctor testified positively that she was unconscious when he first saw her on September 3, 1948, and remained in that condition until her death on September 7, 1948. The deputy sheriff did not relate anything he claimed was said in that conversation. He said he saw her on September 6, 1948, and made some examination of her and saw that she had black and blue bruises above the knees, and a very bad large bruise on her right shoulder blade that came up to her neck; that the skin on her legs and shoulder was not broken; and she gave no evidence of any scratches.

The doctor who examined her soon after she received her injuries, attended her until her death four days later and conducted the autopsy, and said she was unconscious when he first saw her; that she never regained consciousness; that she had no "black and blue spot"; he neither found nor described any injury to her knees, to the right shoulder or neck; and he said the skin of her body was not broken. A probable explanation of this discrepancy was the condition of the deceased while she was in the hospital. She rolled and tossed, was violent and hard to restrain, and a fence was used along the side of the bed in an attempt to keep her in it.

The automobile of the defendant was taken by the sheriff and examined thoroughly inside and out three times. Nothing of any significance was found. There was a car crank in the car which showed no evidence of improper use.

Defendant made conflicting and in some instances untrue statements in reference to the identity of the deceased, his association with her, and other incidental and collateral things, and this he substantially admitted.

He was closely and searchingly examined on four occasions while he was in custody by the officers, but no one claims that he made, and in fact he did not make, any admission from which it could be inferred that he

struck or in any way ill-treated the deceased. He at all times consistently and vigorously denied having assaulted or injured her.

Defendant while a witness, was asked what happened when his car was stopped near the intersection of the roads shortly before the deceased jumped from his car, and he testified, "she wanted to go to Morrill and she was arguing with me * * *. So I decided I'd take her to Morrill, and I started my car up and I had to back to the bridge in order to take this road that goes east, so I started off pretty fast * * * she was just sitting there with me saying nothing, when she all at once said, 'Hell, I am not going to Morrill,' and she threw the door open and jumped out, * * * I * * * heard something pound real hard on the side of the car * * *." He got scared and kept on driving down the road, but in a short time returned to the place where she had jumped from the car. He was driving better than 30 miles an hour when she jumped. He positively denied killing Avis Phillips. A farmer, Irvin Freel, arrived at the place the deceased was found on the road just before the marshal did. He saw the place where she was lying in the road and noticed "right west of it where there had been a place or two something had hit the ground—about three or four places, and then where her body had hit the ground. * * * It looked like something had hit the ground. * * * Well, there was some marks on the ground—three or four marks on the ground. * * * it just been marked in about three or four places, there was marks on the ground, something had drug or hit or something." These marks extended along the ground to the east starting west of the place where Avis Phillips lay. He spoke to Mr. Coffin, the marshal, about these. He also said, "there was a shoe laying someplace, I don't remember where, and then the heel lay there. * * * I believe it was west of her."

The sheriff and a highway patrolman about ten days after the day when the deceased was injured, went to the farm where defendant was employed and picked up

a gallon jug and an army boot. The defendant called his employer, George Schaub, as a witness, and he testified that he had heard the testimony about the jug. He said it was a water jug the defendant had used sometimes in his work on the farm since about June when he started in the beets until they were through with the beets. This jug was chipped at the top, but he had seen this condition before September 3, and he saw the jug after that date and it wasn't any different than it had been before; it had the same chip marks on it before and after September 3; that the defendant had quit carrying it when he finished with the beets, and it had been "laying around the feed shed * * * it sat by the feed shed there." The witness had seen it there many times, and the children of the defendant kicked it around. The witness went to this place to feed his stock, and he noticed the jug there "a lot of times."

The defendant denied that he had any jug with him on September 3, 1948, or that the jug had been in his car or that he had carried it at any time since he had quit work in the beets.

The corpus delicti is the body or substance of the crime, and in its primary sense it is the fact that a crime has been committed without regard to the identity of the person committing it. Whomble v. State, 143 Neb. 667, 10 N. W. 2d 627. It may, as any fact, be proved by circumstantial evidence, but it must be established by evidence beyond a reasonable doubt to sustain a conviction. Harms v. State, 147 Neb. 857, 25 N. W. 2d 287; Wilshusen v. State, 149 Neb. 594, 31 N. W. 2d 544. The crime with which the defendant was charged is, in its essence, that he, without deliberation or premeditation, purposely and maliciously killed Avis Phillips. The fact that she was violently and fatally injured; that the cause thereof is not definitely known; and that the defendant was the person with her before her misfortune, is not evidence that her injuries were feloniously inflicted. The presumption is that her injuries were not of criminal origin.

Harms v. State, *supra*. An extrajudicial admission or confession by the defendant of the essential facts constituting the crime charged would not alone have been sufficient to establish the corpus delicti. Whomble v. State, *supra*. There is in this case uncontradicted evidence produced by the State to the effect that the deceased, without warning, voluntarily jumped from a motor vehicle in which she was riding while it was traveling at a very considerable speed on a highway; that at that time something was heard to strike the vehicle with force; and that she was shortly thereafter found near the place where she left the vehicle in the injured condition which resulted in her death. This was consistent with the spontaneous, unprejudiced impression of the two farmers who were first to discover her in the highway in an injured condition and who reported what they had seen to the marshal at Lyman. They thought she was the wife of a resident of that community, Mrs. Derr. They told the marshal a woman was lying in the road down there like she had been hit by an automobile. That Avis Phillips jumped from the car and was injured is corroborated by the physical facts. The car at the time was traveling easterly. Without dispute of the testimony of the farmer who reached the place where she was before the marshal got there, there were marks on the ground from west of where she was found on the highway to the east of where she was lying. "* * * there had been a place or two something had hit the ground—about three or four places, and then where her body had hit the ground. * * * It looked like something had hit the ground. * * * Well, there was some marks on the ground—three or four marks on the ground. * * * it just been marked in about three or four places, there was marks on the ground, something had drug or hit or something." When she was found lying in the highway she had a shoe on her right foot, the left shoe with the heel detached and the heel were near her in the road. The heel had been detached from the shoe, and the shoe

had been taken from her foot by some force. There was no evidence of any struggle or combat. The evidence of the State tended to show that the injuries inflicted on the deceased were not of criminal origin. The theory or hypothesis that they did not result from a criminal act is a reasonable one. Homicide corpus delicti is not established until it is proved that a human being is dead, and the death occurred as the result of the criminal agency of another. The fact that the deceased sustained severe and fatal injuries which caused her death does not permit an inference that she was foully dealt with. When the State contends that she was, it must prove that her death was the result of a criminal act, and unless and until this is proved, it is presumed that death resulted from innocent, noncriminal causes. Treppish v. State, 126 Neb. 21, 252 N. W. 388; State v. Pienick, 46 Wash. 522, 90 P. 645, 13 Ann. Cas. 800, 11 L. R. A. N. S. 987. There is no evidence in this case as the law requires from which it can be concluded that the injuries were done her and her death was caused purposely and maliciously by the defendant or any other person. McCue v. State, 112 Neb. 9, 198 N. W. 163; Harms v. State, *supra*.

If circumstantial evidence is relied upon in a criminal prosecution, proof of a few facts or of a multitude of facts all consistent with the supposition of guilt is not sufficient to warrant a verdict of guilty. In order to convict, it is necessary not only that the circumstances all concur to show beyond a reasonable doubt that the defendant committed the crime and be consistent with the hypothesis of guilt, since that is to be compared with all the facts proved, but that they be inconsistent with any other rational conclusion and exclude every other reasonable theory or hypothesis except that of guilt. The facts proved must be consistent with each other and with the main fact sought to be established. Any fact or circumstance susceptible of two interpretations must be resolved most favorably to the accused. Treppish v. State, *supra;* Lowe v. State, 110 Neb. 325, 193 N. W.

707; Vinciquerra v. State, 127 Neb. 541, 256 N. W. 78; Dreessen v. State, 38 Neb. 375, 56 N. W. 1024; State v. Johnson, 37 N. M. 280, 21 P. 2d 813, 89 A. L. R. 1368; State v. Heinz, 223 Iowa 1241, 275 N. W. 10, 114 A. L. R. 959; Bowie v. State, 185 Ark. 834, 49 S. W. 2d 1049, 83 A. L. R. 426; Gardner v. State, 27 Wyo. 316, 196 P. 750, 15 A. L. R. 1040; State v. Pienick, *supra.*

When circumstantial evidence is relied upon, the facts and circumstances must form a complete chain and point directly to the guilt of the accused in such a conclusive way as to exclude any other reasonable conclusion, every element essential to the conclusion must be proved by competent evidence beyond a reasonable doubt, and the existence of a reasonable doubt as to any one of them requires an acquittal. Treppish v. State, *supra;* Lowe v. State, *supra;* Walbridge v. State, 13 Neb. 236, 13 N. W. 209; 20 Am. Jur., Evidence, § 1217, p. 1068; Vinciquerra v. State, *supra;* Harms v. State, *supra;* State v. Hooper, 222 Iowa 481, 269 N. W. 431; State v. Sigman, 220 Iowa 146, 261 N. W. 538; State v. Lewis, 69 W. Va. 472, 72 S. E. 475, Ann. Cas. 1913A 1203; State v. Suitor, 43 Mont. 31, 114 P. 112, Ann. Cas. 1912C 230; 23 C. J. S., Criminal Law, § 907, pp. 154 to 156.

Caution should be exercised in drawing inferences from circumstances proved in a criminal case. Suspicion or speculation may never justify a conviction. Circumstantial evidence as a basis of a conviction of crime should be acted on and weighed cautiously, and this is especially true where the crime is heinous. A conviction should not be based on the weakness of the status of the accused, the embarrassing position in which he finds himself, or the mere fact that some unfavorable circumstances are not satisfactorily explained. In determining the sufficiency of circumstantial evidence to support a conviction, each case must be determined on its own peculiar circumstances. Bourne v. State, 116 Neb. 141, 216 N. W. 173; Lowe v. State, *supra;* O'Neil v. State, 118 Neb. 360, 224 N. W. 855; Vinciquerra v. State, *supra;* Hiner v.

State, 196 Ind. 594, 149 N. W. 168; State v. Pienick, *supra;* 23 C. J. S., Criminal Law, § 907, p. 146.

These requirements of the law insulate the defendant from a sustainable conviction in this case. The record shows, without any contradiction, that a very short time before the deceased was injured, she, without any indication of her intention, and with entire absence of provocation, leaped from the vehicle in which she was riding. The car was moving slowly and she suffered no injury from that imprudent act. The defendant protested her conduct and warned of the danger involved. A brief time thereafter she jumped from the car a second time without warning or disclosed reason at or near the place where she was found injured and unconscious in the highway. The speed of the car was much greater on this occasion, and her rash act resulted, so far as the evidence advises, in her injury and death. The details of this have been related in the discussion of the failure of the evidence to show the corpus delicti, and will not be repeated. What is there said is applicable here. The significance of this is that an attempt to alight from a motor vehicle moving at a considerable speed is inherently hazardous and likely to result in probable injury and possible death. The indications are it did in this instance. It is a frequent occurrence that serious injuries from imprudent acts involving the use of motor vehicles are frequent from a minor cause, and conversely, serious accidents involving motor vehicles often result in only minor injury to persons in or about them at the time. The reason for this is many times beyond explanation. This is a reasonable theory or hypothesis of the source of the injuries to the deceased. It is the only rational explanation shown in the record. The evidence is not such to permit of a conclusion that every reasonable theory or hypothesis except that of the guilt of the defendant has been excluded by proof beyond a reasonable doubt.

The difficult situation of the State in this case induces

it to theorize that the defendant ejected Avis Phillips from the car after he "haggled over the price for her services"; that he afterwards overtook her while she was walking; induced her back in the car; took her to an intersection of a much-traveled road at the very boundary of Lyman; and in broad daylight "in a sudden rage struck Phillips in the head with the jug, the only weapon at hand." This is pure speculation, and in its essence is disproved by the evidence of the State. The deceased, if she had been mistreated in any way by the defendant, had an opportunity to complain and escape when she came to the Nolde farm, saw and passed Mr. Nolde in the road, and Mrs. Nolde, who was only a short distance therefrom. It overtaxes credulity to believe that this defendant would have selected a much-frequented highway near the border of a town in mid-afternoon to commit a murder and risk probable detection in the very act when he and his supposed victim had just been in, and could easily have proceeded to and selected, a more secluded place. Likewise, the capabilities ascribed to the defendant for committing murder, with a jug, the evidence shows he did not have, and leave no evidence of a struggle, combat, blood, or trace indicating such to be the fact, is much beyond the probable, rational or reasonable, and what is more important, foreign to any substantial evidence produced. Evidence concerning an instrument which it is contended was used in committing the crime charged is neither competent nor important until there is a showing connecting it with the crime. State v. Davis, 60 Mont. 426, 199 P. 421; People v. Hill, 123 Cal. 571, 56 P. 443; Herman v. State, 75 Miss. 340, 22 So. 873; 16 C. J., Criminal Law, § 1225, p. 619. There is no such foundation in this case.

The State dwells on the fact that the defendant made conflicting and in some instances untrue statements as to his knowledge of and association with Avis Phillips and certain other matters. These are all in reference to incidental and collateral subjects. He was a foreigner

with obvious imperfect knowledge and understanding of or ability to use or express his meaning in the English language, and he was frightened and under the stress resulting from being arrested, detained, and charged with murder. He had no material resources of his own for a defense. Failure of exact frankness and meticulous verity in such a situation is probably not excusable, but it is certainly understandable. However, he was closely, searchingly, and exhaustively questioned and cross-examined on numerous occasions by the officers while he was in custody. He was subjected to various approaches and attitudes of the officers in repeated attempts to induce, pressure, or trick him into or extract from him some statement tending to show his guilt of the offense charged. These attempts were all unsuccessful. No one claims that he made any statement or admission from which it could be understood or inferred that he struck or in any way ill-treated the deceased. He consistently asserted she jumped from the car of her own volition, without warning to him, and he denied in every instance that he assaulted or in any manner injured her.

The challenge of the sufficiency of the evidence by the motion of the defendant made at the close of the evidence of the State should have been sustained. The conviction and sentence of the defendant should be, and they are, set aside, with directions to the trial court to dismiss the case and discharge the defendant.

REVERSED WITH DIRECTIONS TO DISMISS.