278 Neb. 55
STATE OF NEBRASKA, APPELLEE,
v.
CHRISTOPHER A. EDWARDS, APPELLANT.
No. S-07-678.
Supreme Court of Nebraska.
Filed July 10, 2009.
Denise E. Frost, of Johnson & Mock, Steven J. Lefler, of Lefler Law, and Matthew Higgins for appellant.
Jon Bruning, Attorney General, and Kimberly A. Klein for appellee.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
GERRARD, J.

I. NATURE OF CASE
Jessica O'Grady was last seen on May 10, 2006, leaving her apartment on her way to Christopher A. Edwards' house. O'Grady has not been heard from since, by friends or family, and her body has never been found. But O'Grady's blood was found in Edwards' bedroom, on the mattress and walls, and on a weapon found in his closet. And O'Grady's blood was found in the trunk of Edwards' car. Edwards was convicted of second degree murder and use of a deadly weapon for killing O'Grady. The primary issue presented in this appeal is whether the evidence was sufficient to prove that O'Grady was murdered.

II. BACKGROUND

1. O'GRADY'S LIFE AND DISAPPEARANCE
After graduating from high school in Omaha, Nebraska, O'Grady moved into an apartment with her friends Holly Stumme and Tracy Christianson, and at the time of her disappearance, she was working at a steakhouse in west Omaha. Shauna Stanzel, O'Grady's aunt, testified that she and O'Grady were very close and that O'Grady had lived with her for a time as a child. Stanzel said she spoke with O'Grady on a daily basis and agreed that it was "sort of a habit" that they "would call each other daily."
Stumme had been friends with O'Grady since they were both in the fifth grade. O'Grady and Stumme socialized together and talked and text-messaged "all the time." They saw each other every day and also spoke on the telephone often. Stumme testified that Edwards worked at the same steakhouse as O'Grady and that O'Grady spoke to her about Edwards on a regular basis. Stumme and Christianson both described a particular evening in April 2006 on which Edwards came over to O'Grady, Stumme, and Christianson's apartment, and O'Grady and Edwards were "flirting." Edwards was still there when Stumme went to bed, and the next morning, his clothing was still in the living room and his shoes were still by the door. Stumme and Christianson also said that Edwards had been at their apartment on May 9, 2006, the day before O'Grady was last seen.
Stanzel last saw O'Grady on Wednesday, May 10, 2006, after a softball game. Stumme and Christianson last saw O'Grady on the evening of May 10, when they and some other friends met at their apartment. O'Grady was using her cellular telephone to send and receive text messages and had been talking about Edwards throughout the evening. Then after O'Grady received a telephone call, she took a shower, fixed her hair, put on makeup, and left at about 11 or 11:15 p.m. As she left, she told Stumme and Christianson "to wish her luck, she was going to Chris' [residence]" and would see them later.
Keri Peterson, another friend of O'Grady's, said she and O'Grady routinely spoke on the telephone a "[c]ouple times a day." It was "unusual" for the two of them not to talk to one another in the course of a day. They last spoke at about 11:30 p.m. on the evening of May 10, 2006, when O'Grady called Peterson. O'Grady told Peterson that she was in her car, on her way to Edwards' residence. Peterson received a text message from O'Grady about an hour later that said, "No shenanigans for Jessica." Peterson explained that this was "code" for "no sex for Jessica." Peterson did not reply and was unable to reach O'Grady the next day.
The next day, Stumme was also unable to reach O'Grady, and by Friday, when O'Grady still had not come home, Stumme became concerned. Stumme went and talked to Stanzel. Stanzel had called O'Grady on Thursday and left a message, and she tried again on Friday. After speaking to Stumme, Stanzel contacted O'Grady's mother to see if she had heard from O'Grady. O'Grady's mother had not heard from her, so Stanzel's husband called the police.
After O'Grady failed to show up for a Sunday softball game, Stanzel met O'Grady's friends at O'Grady, Stumme, and Christianson's apartment. All of O'Grady's personal effects were still there, as was her cat. Stumme described O'Grady as very attached to her cat, explaining that O'Grady "would feed [her cat] everyday [sic] and any time she went out of town she would almost make me sign something saying that I was going to take care of [her cat]." Christianson similarly said that O'Grady held her cat all the time and called the cat "her baby."
Stanzel also went to the restaurant where O'Grady worked and discovered that O'Grady had not picked up her last paycheck. While she was there, Stanzel spoke to Edwards, who said he had not heard from O'Grady since May 9, 2006. Edwards said that he and O'Grady had planned to get together on May 10, but that he had canceled those plans.
Stanzel never heard from O'Grady again. The last charge to O'Grady's bank account, other than a single regularly recurring charge, occurred on May 10, 2006. O'Grady's vehicle was found in a parking lot across the street from the restaurant where O'Grady worked, about a block and a half away. O'Grady's cellular telephone records reflect a pattern of making and receiving several telephone calls each day, including daily calls to and from Stumme and Peterson. Those records show that O'Grady's last two telephone calls occurred on the evening of May 10: an 11:29 p.m. call to Peterson and an 11:48 p.m. call to Edwards. O'Grady made no telephone calls after 11:48 p.m. on May 10. All the witnesses who testified about calling O'Grady after May 10 reported that their calls were immediately forwarded to O'Grady's voicemail, and O'Grady's telephone records indicated that all the calls made to O'Grady after May 10 were forwarded.

2. EDWARDS' ACTIVITY BEFORE O'GRADY'S DISAPPEARANCE
Michelle Wilkin met Edwards while they were working at the same restaurant in March 2005. They became friends, then developed a romantic relationship. Wilkin became pregnant with Edwards' child in January 2006. Their romantic relationship was purportedly exclusive. Wilkin recalled that on the evening of May 8, she and Edwards had a serious conversation about getting married. But later, when Wilkin became aware that Edwards was being investigated with respect to O'Grady's disappearance, she asked him why the police were interested in him. Edwards admitted to Wilkin that he and O'Grady had slept together. Wilkin testified that Edwards had told her "at some point that he had heard [O'Grady] was pregnant." But Wilkin said Edwards told her that after Wilkin and Edwards had discussed marriage, he had met with O'Grady at his house to tell O'Grady that he and O'Grady would no longer be involved.
Riley Wasserburger, a friend of Edwards since high school, said that he, Edwards, and Alex Ehly played golf together during the evening of May 10, 2006. Wasserburger said that during the course of the game, Edwards said that "he made a mistake, that he got a girl pregnant." Wasserburger could not remember the girl's name. Ehly testified that Edwards had previously told Ehly that he had gotten a girl named "Michelle" pregnant, but admitted that he did not hear the conversation between Edwards and Wasserburger. Then Wasserburger, Edwards, and some other friends went to a movie, which ended at about 11:30 p.m. There was some discussion of going to play poker, but Edwards decided against it, and went to do something else, alone.

3. INVESTIGATION INTO O'GRADY'S DISAPPEARANCE
Omaha police interviewed Edwards in the course of speaking to anyone who had contact with O'Grady in the days before her disappearance. The police obtained permission to search Edwards' bedroom at his aunt's house, where he lived. When an Omaha police detective began to approach the bed, Edwards said he was "'not sure'" he wanted police "'checking that area.'" Police suggested that O'Grady might have hidden a note under the mattress, where Edwards would find it later. Edwards said that "'[made] sense'" to him and permitted the search to continue.
Spattered blood was found on the nightstand, headboard, clock radio, and ceiling above the bed. Edwards was asked to explain the bloodstains on the headboard and clock, and replied that "he had cut his wrist." A small bloodstain was located on the top of the mattress. Edwards was asked about the bloodstain and replied that "he had intercourse with a girlfriend who was menstruating." But on further investigation, a very large, damp bloodstain was found on the underside of the mattress, covering most of the bottom side of the mattress. Bloodstains were later found on the bedding, a chair in the room, a bookcase, and laundry baskets. Luminol, a chemical used to locate where blood has been cleaned up, was applied to the walls of the room. The Luminol suggested blood on large areas of the south and west walls. Stains that appeared to be blood were found on the ceiling, covered up by white paint.
A short sword was found in Edwards' closet. Blood was found on the sword. A shovel and a pair of garden shears were found in Edwards' vehicle. A bloodstain was found on the handle of the garden shears. More bloodstains were found on the trunk gasket of the car and on the underside of the trunk lid. A black, plastic trash bag was found in the garage next to the vehicle. The bag contained two bloodstained towels and a receipt from a drugstore in west Omaha. Edwards had been videotaped purchasing poster paint, white shoe polish, and correction fluid at that drugstore on May 11, 2006, at 7:41 p.m. The poster paint was chemically identical to that found on Edwards' ceiling.
DNA profiles were recovered from blood on the headboard, ceiling, walls, and sword, and from the trunk of Edwards' car. The profile was consistent with O'Grady's DNA profile. Specifically, the chances of another unrelated Caucasian person having the same DNA profile were 1 in 26.6 quintillion. Edwards was excluded as a DNA contributor to nearly all of the samples. DNA profiles were also recovered from blood found on the mattress and were also consistent with O'Grady's DNA profile. The odds of another, unrelated Caucasian person having the same DNA profiles ranged from 1 in 15.6 billion to 1 in 46.5 quintillion. A partial profile was obtained from blood on the garden shears, also consistent with O'Grady's DNA profile; the chance of another, unrelated Caucasian contributor having the same DNA profile was 1 in 3.81 trillion. DNA profiles obtained from blood on the towels found in the garage next to Edwards' car were also consistent with O'Grady's DNA profile; the odds of another, unrelated Caucasian person contributing the DNA found on one of the towels were 1 in 1.96 quintillion, and for the other towel were 1 in 26.7 billion.
A laptop computer was seized from Edwards' bedroom. Forensic examination of the computer revealed that at 2:26 p.m. on May 9, 2006, someone had used that computer to perform Internet research on the human body. Specifically, a Google search had been performed for the term "arteries." The user had then viewed the first search result, a diagram of the human arterial system.
Stuart James, a forensic consultant, performed an analysis of the bloodstains found in the bedroom and car. James testified that the bloodstain on the mattress was a "saturation stain," meaning a volume of blood had been deposited on the surface of the mattress and had soaked into the fabric. James opined that a "significant bloodshed event" had occurred on or close to the mattress. James also opined that the source of the blood spattered on the headboard was over or close to the top of the mattress. And James opined, from the pattern of blood spattered on the ceiling, that it was "cast-off" blood from seven individual swings of an object wet with blood. The stains were more consistent with a thin object, such as the sword found in Edwards' closet, than with a broad object. James opined that the bloodstains in the trunk of Edwards' car, on the garden shears found in Edwards' car, and on the towels found in the garage were transfer stains, produced by contact with a bloody surface.

4. EDWARDS IS CHARGED AND CONVICTED
Edwards was charged by information with murder in the second degree and use of a deadly weapon to commit a felony.[1] Edwards was convicted, pursuant to jury verdict, of both charges. He was sentenced to a term of 80 years' to life imprisonment for second degree murder and a term of 20 to 20 years' imprisonment on the deadly weapon conviction, sentences to be served consecutively.[2] Edwards appeals.

III. ASSIGNMENTS OF ERROR
Edwards assigns, consolidated and restated, that the trial court erred in (1) not dismissing the charges because the evidence was insufficient; (2) refusing his proffered jury instruction defining "death"; (3) admitting testimony from the State's experts regarding DNA evidence; (4) overruling his motion to continue trial; and (5) refusing to permit him to adduce evidence of a nearly empty package of birth control pills found in O'Grady's car, a relationship with another man in which O'Grady allegedly became pregnant and induced a miscarriage with birth control pills, and testimony that O'Grady was pregnant by another man but "wanted" Edwards to be the father.

IV. ANALYSIS

1. SUFFICIENCY OF EVIDENCE
[1-3] Edwards assigns that the court erred in not dismissing the charges because the evidence was insufficient. In reviewing a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact.[3] An appellate court will affirm a criminal conviction absent prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction.[4] The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[5]
[4-6] Edwards' argument is that the evidence failed to establish the corpus delicti of homicide. The corpus delicti is the body or substance of the crimethe fact that a crime has been committed, without regard to the identity of the person committing it.[6] Corpus delicti is composed of two elements: the fact or result forming the basis of a charge and the existence of a criminal agency as the cause thereof.[7] And while the corpus delicti must be established by evidence beyond a reasonable doubt, it may be proved by either direct or circumstantial evidence.[8]
[7] In other words, in arguing that the State did not prove the corpus delicti, Edwards is not arguing that the evidence is insufficient to establish that he murdered O'Gradyrather, he is arguing that the evidence was insufficient to establish that O'Grady was murdered at all. In a homicide case, corpus delicti is not established until it is proved that a human being is dead and that the death occurred as a result of the criminal agency of another.[9] Thus, we must determine whether the State's evidence was sufficient to prove that O'Grady is dead and that her death was the result of a criminal act.[10]
[8] To begin with, it is well recognized that the body of a missing person is not required to prove the corpus delicti for homicide.[11] To require that the victim's body be discovered would be unreasonable; it would mean that a murderer could escape punishment by successfully disposing of the body, no matter how complete and convincing the other evidence of guilt.[12] Instead, the fact that a missing person's body has not been recovered does not mean that death cannot be proved by circumstantial evidence and may tend to prove the corpus delicti:
The fact that [the victim's] body was never recovered would justify an inference by the jury that death was caused by a criminal agency. It is highly unlikely that a person who dies from natural causes will successfully dispose of his own body. Although such a result may be a theoretical possibility, it is contrary to the normal course of human affairs.
The fact that a murderer may successfully dispose of the body of the victim does not entitle him to an acquittal. That is one form of success for which society has no reward.[13]
And in this case, we are satisfied that the evidence presented was sufficient to establish the corpus delicti of homicide. Courts have generally held, under circumstances comparable to these, that the circumstantial evidence associated with the alleged victim's disappearance was sufficient to establish the corpus delicti.[14]
In particular, the evidence detailed O'Grady's habits and relationships and how they were abruptly severed without explanation on May 10, 2006. Proof of such personal connections, and the unlikelihood of such a voluntary, sudden disappearance, is often held to be persuasive circumstantial evidence of death resulting from foul play.[15] O'Grady's car was left in a parking lot, and all of her personal effects, including her cat, were abandoned in her apartment, which also suggests that her disappearance was not voluntary.[16] Nor did O'Grady pick up her last paycheck or take any money from her bank account after her disappearance, which would be unlikely if she had left of her own volition.[17]
And obviously, the fact that significant amounts of what was almost certainly O'Grady's blood were found in Edwards' bedroom and the trunk of his automobile is highly suggestive of an unlawful killing. Such bloodstains have often been held to provide circumstantial evidence of the missing person's death and that it was caused by a criminal act.[18] Courts have also relied upon a suspect's apparent attempts, such as Edwards', to conceal the victim's disappearance, or evidence of the crime.[19] The fact that such evidence also bears on who is guilty does not detract from its efficacy at establishing the corpus delicti.[20] And it does not take much imagination to see how bloodstains on a weapon, garden shears, towels, and the trunk of a car suggest both criminal activity and an explanation for the absence of the victim's body.
[9] Edwards notes that in many of the cases cited above, the conviction was supported with a confession or admission by the defendant. But that is not an unprecedented argument either, and in other cases, circumstances such as those presented here have been sufficient to prove the corpus delicti and support the conviction, without a confession.[21] The law is clear that in the absence of a body, confession, or other direct evidence of death, circumstantial evidence may be sufficient to support a conviction for murder.[22] There is no reason to treat the crime of murder differently from other crimes when considering the use of circumstantial evidence to establish their commission, and "[t]he presence or absence of a particular item of evidence is not controlling. The question is whether from all of the evidence it can reasonably be inferred that death occurred and that it was caused by a criminal agency."[23] The presence of a confession, admission, or incriminating statement is a distinction without a difference.[24] And, as explained above, the circumstantial evidence presented in this case is easily sufficient to support the conviction.
Edwards also argues that the State's evidence failed to prove O'Grady's death under the standards set forth in the Nebraska Probate Code[25] or the Nebraska Uniform Determination of Death Act (UDDA).[26] Edwards' UDDA argument is also presented as a jury instruction argument, and we will discuss it more completely in that context; at this point, it suffices to say that we do not find the UDDA applicable under these circumstances. Nor is the Nebraska Probate Code pertinent. Edwards relies on § 30-2207, which provides:

In proceedings under this code the rules of evidence in courts of general jurisdiction, including any relating to simultaneous deaths, are applicable unless specifically displaced by the code. In addition, the following rules relating to determination of death and status are applicable:
(1) a certified or authenticated copy of a death certificate purporting to be issued by an official or agency of the place where the death purportedly occurred is prima facie proof of the fact, place, date and time of death and the identity of the decedent;
(2) a certified or authenticated copy of any record or report of a governmental agency, domestic or foreign, that a person is missing, detained, dead, or alive is prima facie evidence of the status and of the dates, circumstances and places disclosed by the record or report;
(3) a person who is absent for a continuous period of five years, during which he has not been heard from, and whose absence is not satisfactorily explained after diligent search or inquiry is presumed to be dead. His death is presumed to have occurred at the end of the period unless there is sufficient evidence for determining that death occurred earlier.
(Emphasis supplied.)
[10, 11] Edwards' argument fails for two reasons. First, as the statutory language suggests, § 30-2207 sets forth the evidence that can be used to prove the fact of death in proceedings under the Nebraska Probate Code, not the Nebraska Criminal Code.[27] But beyond that, even if applicable, § 30-2207 does not require that any of those particular methods of proof be used to establish the fact of deathit simply provides that an official death certificate, government report, or 5-year absence support a presumption of death. The statute does not preclude the establishment of death by circumstantial evidence before the expiration of the 5-year period.[28] In fact, by presuming the fact of death from an unexplained 5-year absence, § 30-2207 arguably sets a lower bar for establishing the fact of death than is required in a criminal proceeding.[29] The statutory presumption of death created by § 30-2207 simply has no place in the law of homicide.[30] But in any event, even if § 30-2207 applied here, it was satisfied by the evidence establishing the fact of O'Grady's death.
In short, we find sufficient evidence in the record to support the jury's conclusion that O'Grady was dead and that Edwards killed her. Edwards' first assignment of error is without merit.

2. JURY INSTRUCTION ON DETERMINATION OF DEATH
The jury was instructed that in order to convict Edwards of murder in the second degree, it must find beyond a reasonable doubt that Edwards, "on or about May 10, 2006, did kill Jessica J. O'Grady"; that he "did so in Douglas County, Nebraska"; and that he "did so intentionally, but without premeditation." Edwards proposed an instruction that "[o]nly an individual who has sustained either (1) irreversible cessation of circulatory and respiratory functions, or (2) irreversible cessation of all functions of the entire brain, including the brain stem, is dead. A determination of death must be made in accordance with accepted medical standards." At the jury instruction conference, the court sustained the State's objection to the instruction and refused to give it.
[12-14] Edwards assigns the refusal of his proposed instruction as error. Whether jury instructions given by a trial court are correct is a question of law.[31] When dispositive issues on appeal present questions of law, an appellate court has an obligation to reach an independent conclusion irrespective of the decision of the court below.[32] And to establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction.[33]
Edwards' proposed instruction was based on the UDDA and quoted § 71-7202 verbatim. So, there is little question that it was a correct statement of the law, at least in the abstract. But it was not warranted by the evidence presented in this case, because § 71-7202 was not implicated by these circumstances.
Traditionally, at common law, death was defined by the cessation of the circulatory and respiratory systems.[34] But the development of medical technology, and a better appreciation of human physiology, cast that standard into doubt.[35] Now, a person's respiration and circulation may be artificially supported after all brain functions cease irreversibly, and the medical profession has developed techniques for determining the loss of brain functions while cardiorespiratory support is administered.[36] The UDDA was drafted and enacted to address those advances in lifesaving technology.[37] It codifies the traditional common-law standard for determining death and extends it to include the new procedures for the determination of death based upon irreversible loss of all brain functions.[38] And by providing that the determination of death "be made in accordance with accepted medical standards,"[39] the UDDA leaves the medical profession "free to formulate acceptable medical practices and to utilize new biomedical knowledge, diagnostic tests, and equipment."[40]
In this case, the distinction between cardiorespiratory death and brain death is irrelevant. Under Nebraska law, either would be sufficient to prove the victim's death in a homicide case.[41] Presumably, Edwards is concerned with that part of § 71-7202 requiring a determination of death to "be made in accordance with accepted medical standards." Obviously, there was no evidence in this case that would support such a finding. But there is no indication that the UDDA was intended to supplant the settled common-law rule, discussed at length above, that the fact of death can be proved by circumstantial evidence. To require that death be medically established would amount to requiring direct evidence of death in every homicide, contrary to well-established law. And for that matter, Edwards' expansive reading of § 71-7202 would place it in direct conflict with § 30-2207, set forth above.
[15,16] Generally, statutes which effect a change in the common law are to be strictly construed.[42] We do not read the UDDA as establishing a rule of evidence requiring that in all cases involving an alleged decedent, the fact of death must be medically established. Granted, there may be cases in which the UDDA's medical standards are implicated, when there is a question as to the cause or time of an alleged death, or where there is conflicting medical evidence about the alleged decedent's condition.[43] But in this case, there was no such question. The jury was entitled to conclude from the evidence presented, under any standard, that O'Grady was dead.
In short, the court's instructions correctly set forth the elements of the offense and what the jury needed to find for Edwards to be guilty. Edwards' proposed instruction was not warranted by the evidence, because O'Grady's death was not in medical dispute. His assignment of error is without merit.

3. DNA EVIDENCE
Edwards argues, generally, that the court should have excluded the testimony of witnesses the State presented to explain the DNA evidence adduced at trial. Most of Edwards' arguments are based on the framework set out in Daubert v. Merrell Dow Pharmaceuticals, Inc., and Schafersman v. Agland Coop.[44] Before discussing the specific facts relevant to this issue, it will be helpful to review a few of the basic propositions governing this inquiry.
[17-19] Under the Daubert and Schafersman jurisprudence, the trial court acts as a gatekeeper to ensure the evidentiary relevance and reliability of an expert's opinion. This gatekeeping function entails a preliminary assessment whether the reasoning or methodology underlying the testimony is valid and whether that reasoning or methodology properly can be applied to the facts in issue.[45] The standard for reviewing the admissibility of expert testimony is abuse of discretion,[46] although we review the record de novo to determine whether a trial court has abdicated its gatekeeping function when admitting expert testimony.[47]
[20, 21] To aid the court in its evaluation of the relevance and reliability of an expert's opinion, it may consider several factors, including but not limited to whether the reasoning or methodology has been tested and has general acceptance within the relevant scientific community.[48] Once the reasoning or methodology of expert opinion testimony has been found to be reliable, the court must determine whether the methodology was properly applied to the facts in issue. In making this determination, the court may examine evidence to determine whether the methodology was properly applied and whether the protocols were followed to ensure that the tests were performed properly.[49]

(a) Background
The testing at issue in this case, the results of which were described above, was performed at the University of Nebraska Medical Center (UNMC). The methodology used at UNMC is generally accepted within the relevant scientific community. The standard procedures and protocols used by UNMC are certified by the American Society of Crime Laboratory Directors (ASCLD), which is associated with the Federal Bureau of Investigation, and other outside agencies that inspect the UNMC laboratory. Dr. James Wisecarver, UNMC's laboratory medical director, explained that the procedures, protocols, and equipment used by UNMC were audited and accredited by the ASCLD. Wisecarver testified that the hardware and software used by UNMC were "used by virtually every crime laboratory in the country" and that their "accuracy and authenticity ha[d] been established just through peer review of records by laboratories that have submitted profiles in testing and in serious casework where it's been reviewed." Wisecarver was not aware of any margin of error in the software or any studies establishing a margin of error.
Mellissa Helligso, a forensic DNA analyst at UNMC, testified that to ensure that the testing equipment is working correctly and is not contaminated, the equipment is tested with control samples provided by the equipment manufacturer. Edwards objected to Helligso's testimony on foundational grounds, arguing that a technician was required to testify that the DNA testing equipment she used was operating properly. The objection was overruled, as was a similar objection made to Wisecarver's testimony. Edwards cross-examined Helligso with respect to how many unacceptable test runs had to occur in a row before it was necessary "to shut down and start over." Helligso replied that there were no standards for such an event. Wisecarver simply explained that successful control runs were necessary before the testing could proceed.
Disclaimers on UNMC's equipment state that it is "[f]or research use only" and "[n]ot for use in diagnostic systems." Helligso was unable to explain what the manufacturer might have meant by "research" and "diagnostic" use. After her testimony was completed, Edwards made a motion to strike it on the basis that Helligso had used the testing equipment in a manner inconsistent with how it is intended to be used. The motion was overruled. Later, Wisecarver explained that the disclaimer was there because it was required for any equipment that was not submitted to the federal Food and Drug Administration (FDA) for validation. Wisecarver explained that the cost of submitting some products for FDA approval was prohibitive, but that the products could be approved for general use with appropriate inhouse validation studies. And Wisecarver testified that UNMC had done the appropriate validation studies to confirm that the processes and machines were valid.
Helligso also testified about a genetic mutation found in O'Grady's DNA profile, which produced some aberrant results. Helligso consulted with the testing equipment manufacturer and was assured that O'Grady's mutation was a documented mutation that had been seen in tests across the country.
After Wisecarver testified, Edwards made a motion to strike his testimony, because he was unable to testify about the margin of error and because the testing equipment may not have been calibrated properly. Edwards claimed that there was no evidence of the reliability or accuracy of the testing hardware and software. And Edwards contended that Wisecarver's opinions were not stated "with a reasonable degree of professional certainty." Edwards argued that while "the case law is that it has to be probability not . . . certainty" and "that may not in and of itself be decisive of this motion to strike his testimony," the degree of certainty should be considered "cumulatively with everything else" in deciding the motion to strike.
The court reasoned that most of the information on which the motion was based was available pretrial, through depositions, and that the objection could have been "taken care of. . . a long time ago." Before trial, Edwards had moved for a Daubert/Schafersman order with respect to the State's blood spatter evidence, but not with respect to the DNA evidence. However, regardless of timeliness, the court also concluded that there was sufficient foundation for the witnesses' testimony, opinion or otherwise. So, Edwards' motion was overruled.

(b) Analysis
Edwards' argument, stated generally, is that the court should have stricken the testimony of Helligso and Wisecarver, thus excluding the State's evidence that the blood found in Edwards' home and car was almost certainly O'Grady's. In support of that argument, Edwards calls our attention to several claimed inadequacies in their testimony. He does not appear to contend that any one of those purported defects, standing alone, would suffice to support exclusion of the testimony. Rather, he seems to rely on their cumulative effect. But it is simpler for us to address each claim in turn.
Edwards complains that Helligso and Wisecarver did not testify about how, when, or by whom their testing apparatus had last been calibrated, although at trial, his objection was directed at the fact that the equipment's technician had not been called to lay that foundation. But Helligso testified specifically about how she used control samples to verify that the testing apparatus was functioning properly. The record establishes that Helligso was qualified to use the apparatus, run the control tests, and interpret the results, and Edwards does not claim otherwise. This was sufficient foundation for the proper functioning of the testing apparatus.[50]
Edwards claims that UNMC's instruments should not have been used because they were intended for research purposes, not diagnostics. But Wisecarver testified that the research use disclaimer simply meant the equipment had not been submitted for FDA approval, and there is no suggestion in the record that the equipment was less reliable because it was not FDAapproved. Wisecarver explained that it was appropriate to use equipment approved for research purposes if its accuracy had been verified through an appropriate validation process, as UNMC's equipment had been. In other words, the "in-house" validation substitutes for FDA approval. Edwards' argument is, essentially, another way of framing an attack on the reliability of the equipment. But enough foundation was laid to show that the equipment was operating reliably.[51]
In a related argument, Edwards claims that "[c]ontrary to federal standards and its own protocol, UNMC did not have an outside laboratory or `gold standard' professional peer review the tests and conclusions about which Helligso and Wisecarver testified."[52] This is an apparent reference to Wisecarver's testimony regarding the validation process mentioned above, in which the equipment is validated by testing part of a sample, sending the rest of the sample to an accredited "gold standard" laboratory, then comparing the results. It is not disputed that the DNA evidence tested in this case was not provided to another laboratory for verification. But Edwards has misconstrued Wisecarver's testimony. Wisecarver explained how a particular testing instrument can be validated as reliable for future use, not a process that must be repeated every time the instrument is used.
[22] In other words, Wisecarver explained that once a research instrument passes the "gold standard" validation, its reliability has been established and it can be used without an ongoing need to compare its results to those from other laboratories. There was no need to verify the results in this case with other laboratories, provided that foundation for the reliable functioning of the equipment was laid, which it was. Whether a theory or technique has been subjected to peer review is a factor a court may consider in making its gatekeeping determination.[53] But peer review of the testing performed on the evidence in this case was not necessary, given the undisputed fact that the methods and techniques of DNA testing used by UNMC are accepted and practiced by others in the field.[54]
[23] Edwards also complains that Helligso and Wisecarver did not testify to the margin of error associated with the software for the testing equipment. Another factor the court may consider in making its gatekeeping determination whether expert opinion testimony is relevant and reliable is whether a particular theory or technique has a high known or potential rate of error.[55] But here, the rate of error associated with the theory or technique was not at issue. Instead, Edwards is again questioning the reliability of the testing equipment, which was well established.
Edwards further challenges the reliability of the equipment by noting Helligso's testimony that ASCLD has not established a protocol for how many "unacceptable" control tests can be performed before the equipment must be shut down and restarted. And Wisecarver testified that he was not aware of how many unacceptable tests had been performed before the testing upon which his opinions in this case were based. But Helligso also testified that in this case, in general, there was no problem running any of the controls. The only evidence in the record of repeated unsuccessful tests was explained by Helligso as being the result of a mutation in O'Grady's genetic code, and Edwards does not explain how those results undermine the general reliability of the testing or the equipment used to perform it.
Edwards also claims that "UNMC does not maintain a master log of testing errors or problems to compare from case to case."[56] It is not clear that this is the case. UNMC's laboratory performs both forensic testing, as in this case, and clinical medical work for the UNMC hospital. Edwards' citation to the record for his claim directs us to Helligso's testimony that reported errors in hospital clinical work are logged into the clinical laboratory computer system, but that forensic results are not reported into the hospital clinical system. Helligso did not say that errors in forensic cases were not logged elsewhere. And later in the record, testimony from Wisecarver (to which Edwards did not direct us) suggests that every mistake or error is logged in the laboratory notes.
[24] Our court rules require that factual recitations be annotated to the record, whether they appear in the statement of facts or argument section of a brief.[57] The failure to do so may result in our overlooking a fact or otherwise treating the matter under review as if the represented fact does not exist.[58] While Edwards has provided us with an annotation to the record, it does not support his claim, and other evidence in the record appears to contradict him. In any event, Edwards does not explain how the absence of a master log would affect the reliability of the testing performed in this case.
[25-27] Finally, Edwards complains that Helligso and Wisecarver did not express their opinions in terms of a "reasonable degree of professional certainty."[59] But while that is the preferred form of an expert's opinion, the testimony should be excluded only where it gives rise to conflicting inferences of equal degree of probability such that the choice between them is a matter of conjecture.[60] Expert testimony need not be couched in the magic words "reasonable certainty" or "reasonable probability," but must be sufficiently definite and relevant to provide a basis for the fact finder's determination of an issue or question.[61] In short, an expert's opinion is to be judged in view of the entirety of the opinion, and it is not validated or invalidated solely on the presence or lack of the words "reasonable degree of professional certainty."[62]
Based on our review of the record, we find that Helligso and Wisecarver testified with sufficient certainty for their opinions to be relevant and helpful to the trier of fact.[63] We find, on our de novo review of the record, that the trial court did not abdicate its gatekeeping responsibility.[64] And, after considering all of Edwards' claimed deficiencies in the DNA evidence, we find that the district court did not abuse its discretion in permitting Helligso and Wisecarver to testify.[65] Edwards' assignment of error to the contrary is without merit.

4. MOTION TO CONTINUE
[28-30] Edwards assigns that the district court erred in overruling a motion he made for a continuance. A decision whether to grant a continuance in a criminal case is within the discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion.[66] An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.[67] And there is no abuse of discretion by the court in denying a continuance unless it clearly appears that the party seeking the continuance suffered prejudice as a result of that denial.[68]

(a) Background
Trial was scheduled to begin on a Monday morning. On the preceding Friday, Edwards filed a motion to continue, claiming that it was necessary to continue trial because of evidence that had only been disclosed by the State the day before. The evidence was a police report of an interview with Chayse Bates, in which Bates suggested that O'Grady had, at some point in the past, become pregnant but miscarried. Bates said that O'Grady had claimed to be pregnant, but a home pregnancy test had been negative. Nonetheless, O'Grady told Bates that she had seen a doctor who told her she was pregnant. But sometime after Bates and O'Grady moved into an apartment together, O'Grady "advised [Bates] that she had had a miscarriage, apparently because she was still taking birth control pills."
Edwards contended that the evidence was material, because a nearly depleted package of birth control pills had been found in O'Grady's car and a miscarriage could have explained the blood found on Edwards' mattress. Thus, Edwards asserted that the police report was evidence of a "habit" of pregnancy and induced miscarriage. Edwards' counsel claimed that a continuance was necessary so that she could confer with her client and bring in an expert witness to testify whether birth control pills can be used to induce miscarriage.
The court, however, credited the State's argument that the police report did not provide any information to support Edwards' miscarriage theory that had not already been known to the defense. The possibility that O'Grady had been pregnant, and miscarried, had already been suggested. The court also noted that Edwards had three attorneys, one of whom could work part time on getting expert testimony during the expected 2 weeks of trial. The court overruled the motion to continue.

(b) Analysis
[31] Edwards argues that the court abused its discretion in denying the continuance, because it would have been difficult for counsel to try to "find an expert medical witness by night, while trying a highly publicized murder case during the day."[69] But it is also difficult for a trial court to administer its docket if a highly publicized murder case is delayed immediately before trialparticularly when that case involves a volume of evidence that requires 2 weeks to present. That is why a trial court is vested with wide discretion in disposing of a motion for continuance filed on the eve of trial.
[32] And more importantly, there is no explanation in the record or the briefs why the expert testimony sought by Edwards had not been procured earlier. We have said that where due diligence by the moving party has not been shown, the ruling of the trial court overruling a motion for a continuance for the purpose of securing additional evidence will not be disturbed.[70] The record of the pretrial proceedings in this case makes clear that Edwards was aware of the birth control package found in O'Grady's car and the theory that she might have induced a miscarriage. The police report might have provided some marginal support for that theory, but did not originate it.
In short, Edwards sought to continue a complicated case on the eve of trial in order to procure an expert witness to support a theory that had been present in the case throughout the pretrial proceedings. We find no merit to Edwards' claim that the court abused its discretion in overruling his motion.

5. EVIDENCE OF O'GRADY'S SEXUAL HISTORY
[33,34] Finally, Edwards assigns that the court erred in excluding certain evidence as irrelevant. In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.[71] The exercise of judicial discretion is implicit in determining the relevance of evidence, and a trial court's decision regarding relevance will not be reversed absent an abuse of discretion.[72]

(a) Background
Before trial, Edwards moved for an order permitting him to introduce evidence of O'Grady's sexual history; specifically, her relationship with Chris McClanathan. The State countered with a motion in limine seeking to preclude such evidence, with respect to McClanathan and Bates, under Nebraska's rape shield law.[73] While the court found that the rape shield law was inapplicable, the court concluded that the evidence at issue should be excluded because it was irrelevant and because it was inadmissible character evidence.
When O'Grady's friend Peterson testified, she said that Bates was O'Grady's "ex-boyfriend." On cross-examination, Edwards' counsel was not permitted to ask Peterson why Bates and O'Grady's relationship had ended. Edwards' counsel also made an offer of proof that Stumme and Peterson would, if asked, testify that O'Grady had a sexual relationship with McClanathan. Counsel also proffered that Stumme would have testified that O'Grady told her that O'Grady had a miscarriage in October 2005. And counsel proffered that Peterson would have testified that O'Grady might have been pregnant in a previous relationship and may have had a miscarriage. The State objected to the evidence on the grounds of hearsay, relevance, and the motion in limine, and the offers of proof were overruled.
Later, Edwards offered birth control pills found in O'Grady's car into evidence. Edwards made an offer of proof that if Bates were allowed to testify, he would testify that O'Grady had told Bates that she was pregnant with his child, but had had a miscarriage because she took some birth control pills. Edwards also offered to prove that if Teresa Peterson, Keri Peterson's mother, were allowed to testify, she would testify that Jessica O'Grady had on May 8th of 2006 told Teresa Peterson that she, Ms. O'Grady, was pregnant even though she, Ms. O'Grady, never saw the pregnancy test. That Ms. O'Grady originally said that Ms. O'Grady thought Chris Edwards was the father, but when Ms. Teresa Peterson and Ms. O'Grady talked about her sexual contact with Chris McClanathan and then Chris Edwards, Chris McClanathan's sexual encounter with Ms. O'Grady preceded that of Mr. Edwards.
When Ms. Peterson did the math and went backwards,. . . Ms. Peterson came to the conclusion, based on the information that Ms. O'Grady provided her, that Mr. McClanathan would be the father of the child; if, in fact, Ms. O'Grady was pregnant. And that Ms. Peterson would further say that Ms. O'Grady really wanted Chris Edwards to be the father of the child.
Those offers of proof were also overruled.

(b) Analysis
Edwards argues that the evidence he proffered was relevant and admissible. Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.[74] Evidence which is not relevant is not admissible.[75]
It should be noted, to begin with, that Edwards' appellate brief is devoted to explaining how his proffered evidence was supposedly relevant. This overlooks the fact that the objections sustained by the court were based on relevance and hearsay,[76] and the court's ruling on the motion in limine also concluded that the evidence was inadmissible character evidence.[77] Much of the evidence Edwards sought to adduce was based on hearsay statements allegedly made by O'Grady. And the theory on which Edwards relies to explain its relevance is essentially that O'Grady purportedly committed a previous act and may have acted in conformity with that act in this instance.[78] Edwards' brief does not explain how his proffered evidence, even if relevant, overcame the State's other objections.
But beyond that, the court did not abuse its discretion in concluding that the evidence was irrelevant. Taken at face value, the evidence simply would have established that O'Grady may have used birth control pills and may have previously had a miscarriage. Edwards' theory is that the same thing may have happened againexplaining the blood on his mattressbut the evidence he proffered was insufficient to establish that theory. Evidence is relevant when it tends to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence, and Edwards did not proffer evidence tending to establish that a previous miscarriage, or the use of birth control pills, made it more likely that the blood on Edwards' mattress was the result of another miscarriage. When the relevancy of evidence depends upon the fulfillment of a condition of fact, the judge shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition.[79] But here, there was not sufficient evidence to support the condition of fact upon which the relevance of Edwards' proffered evidence depended.
Edwards suggests that the evidence was admissible under Neb. Evid. R. 406, as "[e]vidence of the habit of a person . . . relevant to prove that the conduct of the person . . . on a particular occasion was in conformity with the habit . . . ."[80] But even if Edwards' evidence proved the single incident that he claims, it would be an insufficient showing of a "routine" or "habit," both because the single incident would not establish a "routine,"[81] and because the relevance of the evidence depends on Edwards' claim that O'Grady engaged in a deliberate volitional act, not a "habit."[82]
[35-37] And Edwards also suggests that the State "opened the door" to his proffered evidence by suggesting, at trial, that Edwards may have been motivated to kill O'Grady because she was pregnant.[83] The concept of "opening the door" is a rule of expanded relevancy which authorizes admitting evidence which otherwise would have been irrelevant in order to respond to (1) admissible evidence which generates an issue or (2) inadmissible evidence admitted by the court over objection.[84] The rule is most often applied to situations where evidence adduced or comments made by one party make otherwise irrelevant evidence highly relevant or require some response or rebuttal.[85] "Opening the door" is simply a contention that competent evidence which was previously irrelevant is now relevant through the opponent's admission of other evidence on the same issue.[86]
The State did not open the door to the proffered evidence. Edwards' motive to commit the crime for which he was on trial was obviously at issue throughout the case, and the evidence he proffered was not responsive to the State's argument. Edwards' proffered evidence was irrelevant, for the reasons explained above, and the State's theory of Edwards' motive did not make his evidence relevant.
[38] In short, Edwards' brief does not address all of the reasons the court found his proffered evidence to be inadmissible, and we are unpersuaded by the argument that he makes. The court did not abuse its discretion in concluding that the evidence was irrelevant. Edwards also argues, briefly, that the court's exclusion of this evidence violated his constitutional right to present a complete defense. But this argument is also without merit, as a criminal defendant has no constitutional right to inquire into irrelevant matters.[87]

V. CONCLUSION
The evidence was sufficient to support the corpus delicti of homicide and Edwards' convictions. We find no error in the district court's refusal of Edwards' proposed jury instruction, denial of his motion for continuance, or rejection of his proffered evidence. To the extent that Edwards also suggests that the court committed cumulative error, his argument is without merit. Therefore, the court's judgment is affirmed.
AFFIRMED.
NOTES
[1] See Neb. Rev. Stat. §§ 28-304 and 28-1205 (Reissue 2008).
[2] See, id.; Neb. Rev. Stat. § 28-105 (Cum. Supp. 1998).
[3] State v. Babbitt, 277 Neb. 327, 762 N.W.2d 58 (2009).
[4] Id.
[5] State v. Draganescu, 276 Neb. 448, 755 N.W.2d 57 (2008).
[6] See, State v. Morley, 239 Neb. 141, 474 N.W.2d 660 (1991); State v. Payne, 205 Neb. 522, 289 N.W.2d 173 (1980).
[7] Gallegos v. State, 152 Neb. 831, 43 N.W.2d 1 (1950), affirmed 342 U.S. 55, 72 S. Ct. 141, 96 L. Ed. 86 (1951).
[8] See, Morley, supra note 6; State v. Casper, 192 Neb. 120, 219 N.W.2d 226 (1974).
[9] See, Payne, supra note 6; Gallegos, supra note 7; Reyes v. State, 151 Neb. 636, 38 N.W.2d 539 (1949).
[10] See Reyes, supra note 9.
[11] See, e.g., Government of Virgin Islands v. Harris, 938 F.2d 401 (3d Cir. 1991); Crain v. State, 894 So. 2d 59 (Fla. 2004); State v. Hall, 204 Ariz. 442, 65 P.3d 90 (2003); Fisher v. State, 851 S.W.2d 298 (Tex. Crim. App. 1993); State v. Nicely, 39 Ohio St. 3d 147, 529 N.E.2d 1236 (1988); Epperly v. Commonwealth, 224 Va. 214, 294 S.E.2d 882 (1982); State v. Pyle, 216 Kan. 423, 532 P.2d 1309 (1975); State v. Lung, 70 Wash. 2d 365, 423 P.2d 72 (1967); People v. Cullen, 37 Cal. 2d 614, 234 P.2d 1 (1951); Bruner v. People, 113 Colo. 194, 156 P.2d 111 (1945), abrogated on other grounds, Deeds v. People, 747 P.2d 1266 (Colo. 1987); Warmke v. Commonwealth, 297 Ky. 649, 180 S.W.2d 872 (1944). Cf. Gallegos, supra note 7.
[12] See, Harris, supra note 11; Nicely, supra note 11; Lung, supra note 11; Cullen, supra note 11; People v. Scott, 176 Cal. App. 2d 458, 1 Cal. Rptr. 600 (1959).
[13] People v. Manson, 71 Cal. App. 3d 1, 42, 139 Cal. Rptr. 275, 298 (1977). Accord, Harris, supra note 11; Epperly, supra note 11.
[14] See, generally, Harris, supra note 11 (collecting cases).
[15] See, e.g., State v. Weston, 367 S.C. 279, 625 S.E.2d 641 (2006); Meyers v. State, 704 So. 2d 1368 (Fla. 1997); Fisher, supra note 11; State v. Grissom, 251 Kan. 851, 840 P.2d 1142 (1992); State v. Brown, 310 Or. 347, 800 P.2d 259 (1990); Nicely, supra note 11; Epperly, supra note 11; Derring v. State, 273 Ark. 347, 619 S.W.2d 644 (1981); Cullen, supra note 11; State v. Head, 79 N.C. App. 1, 338 S.E.2d 908 (1986).
[16] See, e.g., Meyers, supra note 15; Grissom, supra note 15; Brown, supra note 15; Nicely, supra note 11; Lung, supra note 11; Head, supra note 15; Scott, supra note 12.
[17] See, e.g., Brown, supra note 15; Scott, supra note 12.
[18] See, e.g., Weston, supra note 15; Crain, supra note 11; Hall, supra note 11; Fisher, supra note 11; Grissom, supra note 15; Nicely, supra note 11; Epperly, supra note 11; Lung, supra note 11; Cullen, supra note 11.
[19] See, e.g., Weston, supra note 15; Crain, supra note 11; Fisher, supra note 11; Nicely, supra note 11; Bruner, supra note 11; Warmke, supra note 11; Scott, supra note 12.
[20] See Pyle, supra note 11.
[21] See, e.g., Crain, supra note 11; Nicely, supra note 11; Scott, supra note 12.
[22] See Nicely, supra note 11.
[23] See People v. Bolinski, 260 Cal. App. 2d 705, 716, 67 Cal. Rptr. 347, 354 (1968). Accord Harris, supra note 11. See, also, Draganescu, supra note 5; Scott, supra note 12.
[24] See Nicely, supra note 11.
[25] See Neb. Rev. Stat. §§ 30-2201 to 30-2902 (Reissue 2008).
[26] Neb. Rev. Stat. §§ 71-7201 to 71-7203 (Reissue 2003).
[27] See Neb. Rev. Stat. §§ 28-101 to 28-1350 (Reissue 2008).
[28] See Woods v. Estate of Woods, 681 So. 2d 903 (Fla. App. 1996). See, also, Wells v. Equitable Life Assurance Society, 130 Neb. 722, 266 N.W. 597 (1936); Munson v. New England Mutual Life Ins. Co., 126 Neb. 775, 254 N.W. 496 (1934).
[29] Cf. In re Estate of Krumwiede, 264 Neb. 378, 647 N.W.2d 625 (2002).
[30] See Scott, supra note 12.
[31] State v. Fischer, 272 Neb. 963, 726 N.W.2d 176 (2007).
[32] Id.
[33] State v. Pischel, 277 Neb. 412, 762 N.W.2d 595 (2009).
[34] See State v. Meints, 212 Neb. 410, 322 N.W.2d 809 (1982). See, also, State v. Guess, 244 Conn. 761, 715 A.2d 643 (1998); State v. Olson, 435 N.W.2d 530 (Minn. 1989).
[35] See, Meints, supra note 34; Guess, supra note 34; Olson, supra note 34.
[36] See Unif. Determination of Death Act, prefatory note, 12A U.L.A. 778 (2008).
[37] See id.
[38] See id.
[39] Unif. Determination of Death Act, supra note 36, § 1, 12A U.L.A. at 781.
[40] Id., prefatory note, 12A U.L.A. at 779.
[41] See Meints, supra note 34.
[42] Nelson v. Nelson, 267 Neb. 362, 674 N.W.2d 473 (2004).
[43] See, e.g., Meints, supra note 34; People v. Selwa, 214 Mich. App. 451, 543 N.W.2d 321 (1995).
[44] See, Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993); Schafersman v. Agland Coop, 262 Neb. 215, 631 N.W.2d 862 (2001).
[45] State v. Schreiner, 276 Neb. 393, 754 N.W.2d 742 (2008).
[46] Id.
[47] See Fickle v. State, 273 Neb. 990, 735 N.W.2d 754 (2007).
[48] See State v. Davlin, 272 Neb. 139, 719 N.W.2d 243 (2006).
[49] See id.
[50] See State v. Aguilar, 268 Neb. 411, 683 N.W.2d 349 (2004).
[51] See id.
[52] Brief for appellant at 52.
[53] See State v. Fernando-Granados, 268 Neb. 290, 682 N.W.2d 266 (2004).
[54] See King v. Burlington Northern Santa Fe Ry. Co., 277 Neb. 203, 762 N.W.2d 24 (2009).
[55] See Fernando-Granados, supra note 53.
[56] Brief for appellant at 52.
[57] See Neb. Ct. R. App. P. § 2-109(D)(1)(f) and (g).
[58] Sturzenegger v. Father Flanagan's Boys' Home, 276 Neb. 327, 754 N.W.2d 406 (2008).
[59] Brief for appellant at 52.
[60] See State v. Kuehn, 273 Neb. 219, 728 N.W.2d 589 (2007).
[61] See id.
[62] See id.
[63] See id.
[64] See Fickle, supra note 47.
[65] See Schreiner, supra note 45.
[66] State v. Thurman, 273 Neb. 518, 730 N.W.2d 805 (2007).
[67] State v. Davis, 277 Neb. 161, 762 N.W.2d 287 (2009).
[68] Thurman, supra note 66.
[69] Brief for appellant at 59.
[70] State v. Broomhall, 221 Neb. 27, 374 N.W.2d 845 (1985). See, also, Thurman, supra note 66.
[71] Draganescu, supra note 5.
[72] Id.
[73] Neb. Rev. Stat. § 28-321 (Reissue 2008).
[74] Neb. Evid. R. 401, Neb. Rev. Stat. § 27-401 (Reissue 2008).
[75] Neb. Evid. R. 402, Neb. Rev. Stat. § 27-402 (Reissue 2008).
[76] See Neb. Evid. R. 801 and 802, Neb. Rev. Stat. §§ 27-801 and 27-802 (Reissue 2008).
[77] See Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Reissue 2008).
[78] See id.
[79] Neb. Evid. R. 104(2), Neb. Rev. Stat. § 27-104(2) (Reissue 2008).
[80] Neb. Evid. R. 406(1), Neb. Rev. Stat. § 27-406(1) (Reissue 2008).
[81] See, e.g., Thompson v. Boggs, 33 F.3d 847 (7th Cir. 1994); Jones v. Southern Pacific R.R., 962 F.2d 447 (5th Cir. 1992); United States v. Pinto, 755 F.2d 150 (10th Cir. 1985); Wilson v. Volkswagen of America, Inc., 561 F.2d 494 (4th Cir. 1977).
[82] See, e.g., U.S. v. Troutman, 814 F.2d 1428 (10th Cir. 1987); United States v. Sampol, 636 F.2d 621 (D.C. Cir. 1980).
[83] Reply brief for appellant at 13.
[84] Sturzenegger, supra note 58.
[85] Id.
[86] See id.
[87] See State v. Schenck, 222 Neb. 523, 384 N.W.2d 642 (1986).